**UNITED STATES of America,**

v.

**Louis GATTO, Sr. a/k/a "Streaky;" Alan Grecco a/k/a "Alan Wolshonak;" Stefano Mazzola; Louis Gatto, Jr.; Joseph Gatto; William Odierno; Peter Mylenki; and Frank Camiscioli, Jr., Defendants.**

Cr. A. No. 89–250(SSB).

United States District Court,
D. New Jersey.

Sept. 4, 1990.

Michael Chertoff, U.S. Atty. by James C. Patton, Asst. U.S. Atty., Newark, N.J., for U.S.

Miles R. Feinstein, Clifton, N.J., for defendant Louis Gatto, Sr.

Michael A. Querques, Orange, N.J. (Alan L. Zegas, West Orange, N.J., of counsel), for defendant Alan Grecco.

Peter V. Ryan, West Orange, N.J., for defendant Stefano Mazzola.

Harvey Weissbard, Weissbard & Wiewiorka, West Orange, N.J., for defendant Louis Gatto, Jr.

William J. Demarco, Wayne, N.J., for defendant Joseph Gatto.

Michael D'Alessio, Jr., West Orange, N.J., for defendant William Odierno.

David W. Fassett, Roseland, N.J., for defendant Peter Mylenki.

Adolph Galluccio, Paterson, N.J., for defendant Frank Camiscioli, Jr.

438

## TABLE OF CONTENTS

I. FACTS AND PROCEDURE ........................................... 439
 A. Defendant Frank Camiscioli, Jr. ........................................ 439
 B. Defendant Peter Mylenki ................................................ 439
 C. Defendant William Odierno ............................................. 439
 D. Defendant Alan Grecco.................................................. 439
 E. Defendant Joseph Gatto................................................. 443
 F. Defendant Louis Gatto Sr. .............................................. 444
 G. Defendant Louis Gatto Jr................................................ 444
 H. Defendant Stefano Mazzola............................................. 444
II. DISCUSSION ..................................................... 445
 A. Motions for Severance ................................................. 445
 1. Prejudicial Joinder.................................................. 445
 2. Need for Exculpatory Testimony .................................... 451
 B. Motions Attacking the Indictment....................................... 452
 1. Motion to Strike Violent Acts from Indictment ...................... 452
 2. RICO's "Pattern of Racketeering" Requirement is Unconstitutionally Vague ............................................................. 454
 3. Motion to Strike Prejudicial Surplusage ............................ 455
 a. Reference to the "Gatto Group" and "Genovese Crime Family" 455
 b. Aliases ........................................................ 457
 c. "Catch-all" Phrases ........................................... 457
 d. References to Acts of Violence................................. 458
 4. Motion to Dismiss Counts Charging Multiple Offenses .............. 459
 5. Motion to Dismiss Count One for Failure to Specify Predicate Acts 459
 6. Motion to Dismiss Count Two because Predicate Acts are Not Related to Objectives of the Enterprise ..................................... 460
 7. Motion to Dismiss Indictment for Violating the Statute of Limitations 461
 C. Motions In Limine to Bar Introduction of Certain Evidence ............. 464
 1. Admissibility of Coconspirators' Statements........................ 464
 2. Motion to Suppress Statements of Mylenki and Camiscioli........... 465
 3. Motion to Suppress Post–Hypnotic Statements of Frank Galimi...... 465
 (a) Right to Confrontation........................................ 467
 (b) Due Process Rights .......................................... 470
 4. Motion to Suppress Grecco's Statements and Physical Evidence ..... 472
 5. Motion for a Hearing on Admissibility of Mazzola's Convictions ..... 472
 D. Motions for Evidence from the Government ........................... 474
 1. Motion for Brady and Giglio Materials ............................ 474
 2. Early Disclosure of Jencks Materials .............................. 475
 3. Motion for Coconspirators' Statements ............................ 476
 4. Motion for a Witness List ........................................ 476
 5. Motion for a Bill of Particulars.................................... 476
 6. Motion for the Names of Informants .............................. 478
 7. Motion for Rough Notes ......................................... 478
 8. Motion to Serve Subpoenas ...................................... 478
 9. Motion for Disclosure of Grand Jury Transcripts .................. 479
 10. Motions for Disclosure of 404(b) Material of Prior Bad Acts ........ 482
 E. Motions to Dismiss for Improper Governmental Conduct................. 482
 F. Motion to Transfer..................................................... 483
III. CONCLUSION .................................................... 483

## OPINION

BROTMAN, District Judge.

Currently before the court are the pretrial motions of all defendants. The court heard oral argument on defendants' motions on June 8, 1990 and held two evidentiary hearings on defendant Grecco's motion to suppress statements of Frank Galimi on June 13, 1990 and July 30, 1990. The

motions fall within four general categories; motions attacking the sufficiency of the indictment; motions *in limine* to bar introduction of certain evidence; motions for certain evidence from the government; and motions for relief based on the government's improper conduct. Additionally, each defendant has moved for severance of his trial from his codefendants' and to transfer the trial to the Newark vicinage. Many defendants raise the same issues in their briefs; this court will address them *seriatim*.

## I. FACTS AND PROCEDURE

### A. *Defendant Frank Camiscioli, Jr.*

Camiscioli is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 3 (collection of unlawful debt), and Count 5 (numbers gambling business) of the indictment. The government contends that Camiscioli is incorporated by reference in the remaining counts of the indictment although he is not named nor specifically alleged to have a particular role in the conduct charged in Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), Count 4 (sports gambling business), Count 6 (use of interstate telephone in aid of racketeering), Count 7 (interstate travel in aid of racketeering), Count 8 (interstate transportation of wagering records), and Count 9 (extortionate extensions of credit). Camiscioli moves for severance of his trial because (1) he will be unduly prejudiced by harmful "spill over" evidence against other defendants such that the jury will be unable to compartmentalize the evidence effectively as it relates to different defendants; (2) Camiscioli's counsel, in rigorously defending his client, may be required to make prejudicial comments regarding other defendants' exercise of their right to silence, necessitating a separate trial from these codefendants; and (3) Camiscioli's alleged coconspirators can exculpate him in the five counts in which he is not named; therefore, he is entitled to a separate trial so he may compel his coconspirators to testify.

### B. *Defendant Peter Mylenki*

Mylenki also moves for severance raising substantially similar arguments. Mylenki is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 4 (sports gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), and Count 8 (interstate transportation of wagering records) of the indictment. He is not, however, alleged to have participated in any of the eight racketeering acts that involve violence. Mylenki argues that his minuscule participation in the enterprise presents a stark contrast in the degree and kind of evidence against Mylenki as compared to his codefendants; therefore, joinder of his trial with these codefendants is unduly prejudicial.

### C. *Defendant William Odierno*

Odierno is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 4 (sports gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), and Count 8 (interstate transportation of wagering records) of the indictment. Odierno is not named in any of the acts of violence. He moves to sever his trial from his codefendants based on the gross disparity in the quantity and venality of the evidence; he contends that the jury can not reasonably compartmentalize the evidence that relates to separate defendants and he is, therefore, prejudiced by joinder of the trial with his codefendants.

### D. *Defendant Alan Grecco*

Defendant Grecco is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), Count 3 (collection of unlawful debts), Count 4 (sports gambling), Count 5 (numbers gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), and Count 8 (interstate transportation of wagering records) of the indict-

ment. In Count 2, the indictment charges Grecco with participation in seven "racketeering acts," including:

1. the 1976 or 1977 conspiracy to take over the Belli gambling business through the murder of Arthur Belli and the threatening of Robert Belli ("Racketeering Act 1");
2. the 1977 conspiracy to take over the Stumpo–Barbarulla gambling business through threats to Anthony Stumpo and James Barbarulla ("Racketeering Act 2");
3. the April 1979 conspiracy to murder Vincent Mistretta ("Racketeering Act 3");
4. the extortionate collection of credit from Howard Clarke ("Racketeering Act 4");
5. the 1983 or 1984 conspiracy to collect a debt from Anthony Stumpo ("Racketeering Act 5");
6. the unlawful operation of a sports gambling business from 1973 "up to and including the date of filing of the indictment" ("Racketeering Act 8");
7. the unlawful operation of a numbers gambling business from 1974 "up to and including the date of filing of the indictment" ("Racketeering Act 9").

Grecco argues that this court should strike from the indictment any reference to homicides and other violent acts because the charges have been brought in bad faith by the government, are stale, and severely prejudice defendant's ability to obtain a fair trial. He contends that the government, in bad faith, has converted a gambling case into a murder case by including inflammatory allegations of violent acts. Alternatively, Grecco argues that the indictment must be dismissed in its entirety because he has been severely prejudiced by the undue delay of the government in bringing the indictment. Such prejudice includes the absence of potential alibi witnesses who by reason of death or unavailability are unable to testify for defendants concerning the violent acts. Grecco con-

tends that the government deliberately delayed the indictment to gain a tactical advantage; therefore, the court should dismiss the entire indictment. He also contends that the probative value of the evidence of violent acts does not outweigh its unduly prejudicial effect on defendants. Grecco requests that the court determine *in limine* whether evidence relating to the violent acts in the indictment is admissible under Rule 403 of the Federal Rules of Evidence.

Grecco also contends that the government has failed to turn over all exculpatory evidence within the purview of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (suppression of evidence favorable to accused violates due process regardless of government's good faith). Defendant contends that the government has not turned over any material relating to the credibility of significant government witnesses as required by *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (nondisclosure of evidence affecting credibility of government witness falls within *Brady* rule). Grecco disputes the government's distinction between *Brady* material and *Giglio* material and argues that the government must supply these materials in useable form, such as trial transcripts. Defendant also argues that, to the extent materials fall within the definition of both *Giglio* and the Jencks Act, 18 U.S.C. § 3500 (statements of government witnesses not subject to pretrial disclosure), constitutional due process requirements govern the timing of the turnover of the materials rather than the statutory limits in the Jencks Act.

Grecco requests a bill of particulars under Rule 7(f) of the Federal Rules of Criminal Procedure identifying all his alleged coconspirators. He also requests dates, times, and locations of the alleged offenses charged in the indictment as well as every offense that the government intends to prove at trial.[1]

---

**1.** Specifically, Grecco requests a bill of particulars setting forth the following information: *Count 1.*

¶ 1(a). Identify and provide the addresses of all unindicted coconspirators and all "others

Defendant requests disclosure of the names and last known addresses of government informants. Grecco contends that the balance between the government's need for confidentiality and the defendants' need for the information tips in favor of the accused.

Grecco seeks a pretrial hearing on the admissibility of evidence of other crimes, wrongs, or acts that the government intends to introduce at trial under Rule 404(b) of the Federal Rules of Evidence. Grecco argues that a pretrial determination of admissibility is necessary so that he may argue against this evidence in his opening statement to the jury. He also argues that the evidence the government seeks to introduce will require substantial investigation by defendants; therefore, defendants must have immediate disclosure if they are to receive a fair trial. Additionally, he argues that a pretrial determination will avoid undue delay during the trial.

Defendant requests an order for the government to preserve rough notes and handwritten drafts prepared by any government agent in connection with this investigation.

known and unknown to the Grand Jury who are not named as defendants;"

¶ 1(d). Identify the address of the headquarters located in Bergen County and the addresses of the places in which the defendants "operated throughout Bergen County and elsewhere in New Jersey and New York;"

¶ 1(e)(i). Identify the addresses of the apartments in New York and the name of the "full-time employees who accepted bets" and "Supervisors" who ran the office;

¶ 1(e)(ii). Identify the names of the "associates," "runners," and "high ranking associated;"

¶ 1(f). Identify all operators of allegedly competing gambling groups and all persons who conspired to murder Arthur Belli;

¶ 1(g). Identify names of "members of the group" who murdered Vincent Mistretta and staged an attack on Stefano Mazzola;

¶ 1(h). Identify names of "group members" who "obtained paychecks and tax forms from businesses associated with the 'Gatto group'" and identify the names of the businesses;

¶ 1(k). Specify dates of all meetings, names of all persons murdered and the dates and places of each murder or extortionate act in which defendant allegedly participated;

¶ 2. Identify the specific dates of the alleged conspiracy.

*Count 2.*

¶ 2. Identify the names of the "others" and the addresses of the places referred to as "elsewhere."

Racketeering Act 1. Identify the names of the "others," the date and place of the murder of Arthur Belli, the dates and places of each alleged threat to Arthur Belli or Robert Belli, the dates and places of and participants in each meeting where the murder of Arthur Belli was planned;

Racketeering Act 2. Identify the names of the "others" and the addresses of the places referred to as "elsewhere" and the dates and places of threats to Anthony Stumpo and James Barbarulla;

Racketeering Act 3. Identify the names of the "others" and the address of the places referred to as "elsewhere" and the means of the murder and names of any witnesses to it;

Racketeering Act 4. Identify specific date that defendant confronted Clarke and the place of the threat;

Racketeering Act 5. Identify the bettor sponsored by Stumpo;

*Count 3.*

¶ 2. Identify names of "other" persons and addresses of places referred to as "elsewhere;"

Forfeiture count. Identify bank account numbers and numbers of safe deposit boxes at various banks sought to be forfeited;

*Count 4.*

¶ 2. Identify names of "other" persons and addresses of places referred to as "elsewhere" and identify address of place of sports gambling business;

*Count 5.*

¶ 2. Identify names of "other" persons and addresses of places referred to as "elsewhere" and identify address of place of numbers gambling business;

*Count 6.*

¶ 3. Identify names of all bettors;

¶ 4. Identify location of each apartment referred to;

¶ 5. Identify names of "other" persons and addresses of places referred to as "elsewhere" and dates of wrongful acts, places and telephone numbers of telephones referred to;

*Count 7.*

¶ 2. Identify location of apartments;

¶ 3. Identify persons traveling, dates of traveling, and places traveled to and from;

¶ 4. Identify names of "other" persons and addresses of places referred to as "elsewhere;"

*Count 8.*

¶ 2. Identify addresses of apartments and names of bettors;

¶ 3. Identify the name of each associate and employee and telephone number referred to;

¶ 4. Identify the name of each associate and employee and identify the address of each place traveled to and from; and

¶ 5. Identify names of "other" persons and addresses of places referred to as "elsewhere" and each specific type of other device.

Grecco argues that the definition of a "pattern of racketeering activity" is unconstitutionally vague; therefore, those counts of the indictment charging him with RICO violations must be dismissed. He contends that courts' widely divergent definitions of "pattern" do not put defendants on notice of what conduct is proscribed by the statute.

Grecco requests an order striking surplusage from the indictment. Essentially, defendant requests that the court strike any reference to the "Gatto group" or "group;" to any acts of violence; and to any "racketeering act" as unduly prejudicial.

He also argues that prosecutorial abuses in this case require disclosure of all grand jury transcripts and attendance records of the grand jury. According to Grecco, disclosure is mandated here because the government delayed the indictment in bad faith, the government failed to turn over exculpatory evidence, and defendant suspects the government did not present exculpatory evidence to the grand jury.

Grecco contends that the government failed to comply with Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure by its failure to disclose the substance of any oral statements made by the defendant to a government agent or the substance of co-conspirators' statements that the government will seek to introduce under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Defendant's brief also refers to a "significant amount of documentary evidence that defendant has reason to believe is in the government's possession" that the government allegedly has not disclosed to defendant; however, he does not specify what materials are held by the government.

The defendant argues that, although he is not entitled as a matter of right to a list of witnesses, the circumstances in this case warrant pretrial disclosure of the names of anticipated witnesses. Specifically, Grecco contends that the acts alleged are so old that he will not be able to prepare his defense properly without the names of potential witnesses.

In his motion to dismiss the indictment, Grecco again cites to preindictment delay as egregious governmental conduct that warrants dismissal. Defendant notes that the government's failure to provide discovery adds to outrageous nature of the government's misconduct.

Grecco moves to suppress the post-indictment statements of codefendants Mylenki and Camiscioli. He argues that the statements are not admissible under *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968) (admission of codefendant's confession in joint trial violates defendant's right to cross-examine) because such evidence violates his constitutional right to confrontation if the declarant does not testify at the trial.

According to the defendant, the indictment charges multiple offenses within a single count, thereby violating Rule 8 of the Federal Rules of Criminal Procedure. Grecco asserts that, in the first count of the indictment and in subsequent counts that incorporate Count 1 by reference, the government charges two separate conspiracies—one for sports gambling and one for numbers gambling. Noting that a jury could find a defendant guilty of sports gambling but not of numbers gambling yet its verdict would not reflect that outcome, defendant argues that counts charging multiple offenses in a single count must be dismissed.

Grecco argues that his trial must be severed from that of his codefendants because certain codefendants could exculpate him if they testified at a separate trial. Specifically, Grecco asserts that Joseph Gatto could exculpate him from the government's charge that he threatened Stumpo in Gatto's presence and that he attended a meeting to plan the murder of Arthur Belli. Contending that a separate trial would serve the interests of judicial economy, Grecco also notes that Gatto is not easily impeachable because he has no prior record. Additionally, he argues that his trial must be severed because the disparity in the quantum of evidence against him as compared to his codefendants will result in prejudice if their trials are joined. He

maintains that the jury will be unable to compartmentalize the evidence against each defendant and to avoid using evidence relevant to another against him.

The defendant also seeks an *in limine* ruling on the admissibility of alleged coconspirators' statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence. He contends that the government can not meet its burden to show existence of a conspiracy or that statements occurred during the course of the conspiracy or were in furtherance of the conspiracy.

Grecco contends that Count 1 of the indictment fails to specify the predicate acts to establish a pattern of racketeering activity because it alleges the pattern was "of the type" alleged in Count 2 of the indictment. He argues that this language fails to give notice of the specific predicate acts he is alleged to have committed.

Defendant also argues that the predicate offenses alleged in the indictment are not related to each other or to the alleged objectives of the enterprise as required by 18 U.S.C. § 1962(c). Under *Sedima, S.P. R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), sporadic activity does not establish a pattern under 18 U.S.C. § 1962(c); rather, the predicate acts must be continuous and relate to the objectives of the enterprise. *Id.* Grecco argues that the predicate acts are unconnected because they occurred sporadically over a long period of time; thus, this court must dismiss Count 2 for failure to state an essential element of the crime.

Defendant seeks an order permitting him to serve subpoenas upon third parties who possess documents and other materials that are, according to defendant, critical to his defense.

Grecco argues that the statute of limitations for most federal crimes, 18 U.S.C. § 3282, bars the RICO offenses charged. He argues that those cases that hold a RICO charge is timely charged if at least one predicate racketeering occurs within five years of the indictment do not apply here because the predicate acts are not continuous and are not related.

Grecco moves to suppress the statement of Frank Galimi, a witness to the Mistretta murder, that was made while Galimi was under hypnosis. He argues that the statement is inadmissible because it is inherently unreliable and was given under suggestive circumstances. Defendant fails to specify what conditions existed at the time of the statement. Defendant notes that the statement is inconsistent with Galimi's prior statements and with police reports of the incident.

Although the government has not advised defendant that it possesses statements or evidence from him, however, defendant requests a suppression hearing in the event that the government comes forward with any such evidence.

Additionally, Grecco moves to transfer venue to the Newark vicinage because the attorneys, parties, are evidence are located in the Newark area. He argues that the length of this complex trial reduces his attorney's time for preparation and increases the cost of his defense.

Finally, Grecco moves to join in all motions of his codefendants.

### E. *Defendant Joseph Gatto*

Defendant Joseph Gatto is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), Count 3 (collection of unlawful debts), Count 4 (sports gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), Count 8 (interstate transportation of wagering records), and Count 9 (financing extortionate extensions of credit) of the indictment. In Count 2, the indictment charges Joseph Gatto with participation in five "racketeering acts," including:

1. the 1976 or 1977 conspiracy to take over the Belli gambling business through the murder of Arthur Belli and the threatening of Robert Belli ("Racketeering Act 1");

2. the 1977 conspiracy to take over the Stumpo–Barbarulla gambling business through threats to Anthony Stumpo and James Barbarulla ("Racketeering Act 2");

3. the 1983 or 1984 conspiracy to collect a debt from Anthony Stumpo ("Racketeering Act 5");

4. the unlawful operation of a sports gambling business from 1973 "up to and including the date of filing of the indictment" ("Racketeering Act 8");

5. financing extortionate extensions of credit ("Racketeering Act 10").

Joseph Gatto joins in all motions of codefendants Grecco and Mazzola.

### F. *Defendant Louis Gatto Sr.*

Defendant Louis Gatto Sr. is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), Count 4 (sports gambling), Count 5 (numbers gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), and Count 8 (interstate transportation of wagering records) of the indictment. In Count 2, the indictment charges Louis Gatto Sr. with participation in two "racketeering acts," including:

1. the 1976 or 1977 conspiracy to take over the Belli gambling business through the murder of Arthur Belli and the threatening of Robert Belli ("Racketeering Act 1");

2. the April 1979 conspiracy to murder Vincent Mistretta ("Racketeering Act 3").

Louis Gatto Sr. join in all motions brought by all codefendants.

### G. *Defendant Louis Gatto Jr.*

Defendant Louis Gatto Jr. is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), Count 4 (sports gambling), Count 6 (use of interstate telephone facilities in aid of racketeering activities), Count 7 (interstate travel in aid of racketeering), and Count 8 (interstate transportation of wagering records) of the indictment. In Count 2, the indictment charges Louis Gatto Jr. with participation in two "racketeering acts," including:

1. the 1977 conspiracy to take over the Stumpo–Barbarulla gambling business through threats to Anthony Stumpo and James Barbarulla ("Racketeering Act 2");

2. the unlawful operation of a sports gambling business from 1973 "up to and including the date of filing of the indictment" ("Racketeering Act 8").

Louis Gatto Jr. joins in all motions of codefendant Grecco and point two of codefendant Mazzola's brief.

### H. *Defendant Stefano Mazzola*

Defendant Mazzola is named in Count 1 (RICO conspiracy under 18 U.S.C. § 1962(d)), Count 2 (substantive RICO count under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2), and Count 4 (sports gambling) of the indictment. In Count 2, the indictment charges Mazzola with participation in five "racketeering acts," including:

1. the 1976 or 1977 conspiracy to take over the Belli gambling business through the murder of Arthur Belli and the threatening of Robert Belli ("Racketeering Act 1");

2. the 1983 or 1984 conspiracy to collect a debt from Anthony Stumpo ("Racketeering Act 5");

3. the 1977 conspiracy to collect a debt from Robert Lipani ("Racketeering Act 6");

4. the 1983 conspiracy to collect a debt from Robert Lipani ("Racketeering Act 7");

5. the unlawful operation of a sports gambling business from 1973 "up to and including the date of filing of the indictment" ("Racketeering Act 8").

Mazzola moves for essentially the same relief as Grecco. In his omnibus motion, Mazzola seeks:

(1) a severance based on the same prejudice arguments as Grecco's motion;

(2) a pretrial hearing to determine admissibility of other crimes and wrongdoings under Rule 404(b) of the Federal Rules of Evidence;

(3) a bill of particulars for substantially the same information as Grecco;

(4) that this court strike prejudicial surplusage from the indictment;

(5) an order for the government to disclose *Brady* and *Giglio* materials;

(6) a pretrial hearing on the admissibility of coconspirators' statements, arguing that the government must show, by independent evidence, that a conspiracy existed;

(7) early disclosure of Jencks Act material;

(8) an order that the government retain all rough notes and reports, including the rough notes of the government attorney from interviews of witnesses which notes, according to Mazzola, may not be protected by the attorney work product privilege;

(9) an *in limine* hearing to determine whether his prior conviction is admissible for impeachment purposes under Rule 609(a)(1) and (2) of the Federal Rules of Evidence. He argues that a pretrial determination is required so he may make a tactical decision whether he should testify at trial;

(10) an order that the government to disclose the identity of confidential informants because, considering the requirements of fundamental fairness, the informer's privilege should not apply;

(11) an *in camera* review by the court of the grand jury transcripts to determine whether the transcripts should be disclosed to defendants.

Mazzola's motion to dismiss Counts 1, 2, and 4 of the indictment argues that these counts are barred by the statute of limitations. Mazzola notes that four of the five racketeering acts with which he is charged occurred more than five years before the indictment. He also contends that, by virtue of his imprisonment, he affirmatively withdrew from and abandoned any conspiracy; therefore, he is not liable for the acts of his alleged coconspirators. To satisfy the statute of limitations for the substantive RICO offense, here Count 2, the government must show that the defendant committed at least one predicate racketeering act within the five year limitations period.

## II. DISCUSSION

### A. *Motions for Severance*

#### 1. Prejudicial Joinder

 Under Rule 14 of the Federal Rules of Criminal Procedure, this court may order separate trials, or whatever other relief justice requires, if it appears that a defendant is prejudiced by joinder of offenses. Fed.R.Crim.P. 14. A motion for severance is committed to the sound discretion of the district court. *United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978). Denial of a motion for severance is inappropriate, however, if there is a great disparity in the amount of evidence between the moving defendant and his or her codefendants. *United States v. Peters,* 791 F.2d 1270, 1302 (7th Cir.) (disparity in quantum of documentary evidence did not cause actual prejudice), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). In such instances, the relevant inquiry is whether a jury has the capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against that defendant. *Id.* (limiting instructions during course of trial and in final charge sufficient to prevent transference of guilt); *United States v. DiPasquale,* 740 F.2d 1282, 1294 (3d Cir.1984) (court's repeated instructions to jury and government's well-ordered presentation of case averted serious prejudice to defendant who played comparatively small part in conspiracy), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *United States v. Kendall,* 665 F.2d 126, 137 (7th Cir.1981) (interim instructions and "positive and clear instructions at the close of the case" not likely to result in jury confusion), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). "[T]he primary consideration is whether the jury can compartmentalize the evidence

as it relates to separate defendants...." *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir.1971) (unfavorable impression created by codefendant's identification with unpopular social and political group and prior imprisonment did not require severance), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972).

 Alleged participants in a single conspiracy, however, "should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another." *United States v. Ward*, 793 F.2d 551, 556 (3d Cir.1986). *See also United States v. De Peri*, 778 F.2d 963 (3d Cir.1985) (defendant not entitled to severance merely because evidence against codefendant more damaging than against him or her), *cert. denied sub nom., Pecic v. United States*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir.1985) (neither disparity in evidence nor evidence more damaging to one defendant than another entitles less culpable defendant to severance), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988). To warrant severance among alleged coconspirators, "[s]ome exacerbating circumstances, such as the [prospective] jury's inability to 'compartmentalize' the evidence, are required." *United States v. Adams*, 759 F.2d 1099, 1112–13 (3d Cir.) (citing *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir.1976) (with frequent and clear instructions, jury can compartmentalize complex evidence of codefendants' prior diversion of corporate funds), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985)). A defendant must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial. *Ward*, 793 F.2d at 556.

> Among the factors the court must consider in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice" are the following: the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between the various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

*United States v. Gallo*, 668 F.Supp. 736, 749 (E.D.N.Y.1987), *aff'd*, 863 F.2d 185 (2d Cir.1988). *See also United States v. Sandini*, 888 F.2d 300, 306 (3d Cir.1989) (severance not required where defendant offered conclusory allegations that his defense was "truly antagonistic" and "mutually exclusive" to codefendant's), *cert. denied*, —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. Mardian*, 546 F.2d 973, 977–78 (D.C.Cir.1976) (disparity in amount of evidence against defendant charged with conspiracy and not with substantive counts makes fairly strong case for severance where defendant made 5 of 45 overt acts in furtherance of conspiracy). "None of the factors are themselves dispositive; instead, the court must decide whether the jury would be 'reasonably able' to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators." *Gallo*, 668 F.Supp. at 749.

Courts have frequently severed trials based on these factors. In *United States v. Gallo*, 668 F.Supp. 736 (E.D.N.Y.1987), *aff'd*, 863 F.2d 185 (2d Cir.1988), the United States District Court for the Eastern District of New York held that compartmentalization of evidence would be very difficult or unlikely as to several of the fourteen defendants; thus, severance of the trial into seven discrete trials was appropriate. *Id.* at 749, 758–60. The twenty-two count indictment originally named sixteen defendants; Count 1 named thirteen of the sixteen defendants for conspiring to participate in the affairs of a racketeering enterprise and the remaining counts named fourteen defendants with various substantive offense relating to the affairs of the alleged enterprise. *Id.* at 738. The non-RICO counts all concerned crimes that

were alleged as predicate acts in the RICO conspiracy count. *Id.* The court noted that, as the number of counts and defendants in an indictment increases, the resultant complex trial record makes it more difficult for a jury to keep straight the specific evidence and charges against each defendant. *Id.* at 749. Such difficulties are compounded for those defendants against whom only a small portion of the evidence is relevant. *Id.* at 750. The court noted that " '[i]nevitable prejudice' to the peripheral defendants is caused by the 'slow but inexorable accumulation of evidence' against the major players." *Id.* (quoting *United States v. Kelly,* 349 F.2d 720, 759 (2d Cir.1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966)). Such prejudice would be "especially acute for those defendants whose alleged activities did not include the sort of violent or heinous offenses with which some of their brethren are charged." *Id.* The court noted, however, that as alleged members of the crime family, these defendants were likely to be aware of the nature of the ongoing activity and the jury could infer that they may have acquiesced in the more violent aspects of the racketeering enterprise. *Id.* at 751.

The court added that the various defenses offered would almost inevitably be antagonistic to one another given the sheer number of defendants, weighing in favor of severance. *Id.* According to the court, the morass of alleged conspiracies within conspiracies, defendants joining and leaving certain conspiracies, and conspiracies to conceal other conspiracies would require that the jury heed extraordinarily intricate limiting instructions which, given the numerous defendants and charges, would be virtually impossible. *Id.* at 752. While the court recognized that the jury can and will follow limiting instructions, it nonetheless found the trial judge must first be convinced that the jury "has a reasonable chance of understanding and acting upon instructions from the court." *Id.* Given that the jury would be expected to retain precise distinctions for weeks and months until they retired to deliberate, the court

found that such limiting instructions would be inadequate. *Id.* at 753.

Finally, the court considered the inherent power of the court to control the administration of complex cases. The court noted that these "monster" trials work severe hardships on the jurors selected because they are removed from their normal lives for inordinate stretches of time. *Id.* at 754. *See also United States v. Vastola,* 670 F.Supp. 1244, 1263 (D.N.J.1987) (exceedingly long trial hinders jury's ability to devote its full attention to trial), *aff'd in part and rev'd in part,* 899 F.2d 211 (3d Cir.1990), *vacated on other grounds,* — U.S. —, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990). Those defendants detained before trial are especially disadvantaged. *Gallo,* 668 F.Supp. at 753. The defense attorneys virtually sacrifice the remainder of their practices during the extended trial. *Id.* at 754. Finally, the court must adjourn the remainder of its civil and criminal calendars for an indefinite period of time. *Id.* at 755. *See also Vastola,* 670 F.Supp. at 1263 (scheduling problems reduced by severance). Acknowledging that severing a large conspiracy case often necessitates "duplicitous, time-consuming and expensive trials," the court found that the primary duplicative evidence was the "enterprise" evidence introduced to show the existence, structure, and operations of the "Family," and that this evidence did not consume a great deal of trial time. *Gallo,* 668 F.Supp. at 756, 757. The court noted that the prosecution's familiarity with the strength of its proofs and the jury's response to it and the court's familiarity with the nature of the case and the evidence would result in a quicker and smoother pace in later trials. *Id.* at 757. Additionally, trial time could be saved if, after exposure to the government's case in early trials, defendants may plea. *Id.* The court, therefore, severed the trial into (1) a group of three defendants charged with offenses and predicate acts involving a single, discrete episode of criminal activity; (2) a single defendant charged only with obstruction of justice—a count that was ultimately dismissed without going to trial; (3) a single defendant not charged with the substantive RICO

count, but with assisting in bribery and interstate travel relating to a single episode of criminal activity—a charge that resulted in a guilty plea; (4) a group of three defendants who were the only defendants charged in the predicate acts of obstruction of justice by disseminating grand jury matters, although other discrete charges were filed against two of the three; (5) a single defendant who was the only defendant charged with predicate acts that also formed the basis of two substantive counts; (6) a group of four defendants whose conduct concerned two primary areas of criminal activity which were substantially unique to these defendants; and (7) a single defendant for which all charges against him involved no other defendants. *Id.* at 758–60.

■ The United States Court of Appeals for the Second Circuit has recently given further guidance to district courts in considering severance motions in large-scale criminal trials. In *United States v. Casamento*, 887 F.2d 1141 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), the Second Circuit held that severance was not required notwithstanding the complexity of joint trial of twenty-one defendants that spanned more than seventeen months and involved the introduction of thousands of exhibits and the testimony of over 275 witnesses. *Id.* at 1154. Having misgivings about trials of this magnitude, the court set forth bench marks for the district court to guide the exercise of its discretion for severance motions. *Id.* at 1151–52. According to the Second Circuit, a trial judge should first elicit from the prosecutor a good faith estimate of the time reasonably anticipated to present the government's case; the court need not accept the estimate without question but should be free to make an independent assessment based on various factors, including the number of defendants, the time and territorial scope of the crimes charged, the number of witnesses likely to be called, and the number and size of exhibits likely to be introduced, including wiretaps. *Id.* The court stated that, when the government's case will last more than four months, the prosecutor should "present a

reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants." *Id.* at 1152. When the government's case will last more than four months and is brought against more than ten defendants, then the prosecutor should make "an especially compelling justification for a joint trial...." *Id.* In making a showing for a joint trial, the court should weigh the interests of the prosecution, the defendants, the jurors, the court, and the public. *Id.*

The United States District Court for the Southern District of New York applied these criteria in *United States v. Gambino*, 729 F.Supp. 954 (S.D.N.Y.1990). In *Gambino*, the district court severed the trial of fifteen defendants, ten of whom were before the court, into two groups on a seven count indictment alleging 172 overt acts in furtherance of a conspiracy. *Id.* at 971. One group consisted of the "core of conspirators" who were alleged to have committed almost all acts of violence, including murders, set forth in the indictment. *Id.* The second group consisted of those who "oversaw and facilitated the transportation, smuggling and storage of ... narcotics" and whom the grand jury found participated in a single narcotics conspiracy. *Id.* The court noted that this division would minimize the prejudicial spillover of the alleged acts of violence. *Id.*

In *United States v. Vastola*, 670 F.Supp. 1244 (D.N.J.1987), *aff'd in part and rev'd in part*, 899 F.2d 211 (3d Cir.1990), *vacated on other grounds,* — U.S. —, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990), this court declined to sever individual defendants charged in the substantive RICO counts from those named in the RICO conspiracy counts of a 114–count indictment naming twenty-one defendants. *Id.* at 1261–62. Rather, the court severed those defendants charged in the substantive RICO and RICO conspiracy counts from those named only in counts for narcotics, usury and extortion, mail fraud, wire fraud, copyright fraud, insurance fraud, bankruptcy fraud,

gambling, and firearms offenses. *Id.* The court reasoned that, to force the government to try some of the alleged criminal activities separately from others alleged to be part of the same RICO enterprise would prevent the government from prosecuting the type of crimes the statute was intended to combat. *Id.* at 1262 (citing *United States v. Persico,* 621 F.Supp. 842, 854 (S.D.N.Y.), *aff'd,* 774 F.2d 30 (2d Cir.1985)). The court continued that the indictment properly pleaded a RICO enterprise conspiracy and, thus, all defendants so named to be members of the enterprise could be joined under Rule 8(b) of the Federal Rules of Criminal Procedure. *Id.* (citing *United States v. Somers,* 496 F.2d 723, 729 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974) (Rule 8(b) motion addresses pleadings and not subsequent proof)). The court noted its continuing obligation under Rule 14 to evaluate the prejudicial effect of evidence of different types of criminal activity, such as white collar crime and extortion and narcotics activity, and to take necessary steps to avoid such prejudice. *Id.*

■ Here, eight defendants are named in a nine count indictment. Each defendant is named in Count 1 alleging a RICO conspiracy under 18 U.S.C. § 1962(d). The indictment does not specify overt acts taken in furtherance of the alleged conspiracy in Count 1; rather, it incorporates by reference the racketeering acts, and the overt acts in furtherance of those racketeering acts, alleged in Count 2. Each defendant is either named or incorporated by reference in Count 2, the substantive RICO charge under 18 U.S.C. § 1962(c) and aiding and abetting under 18 U.S.C. § 2. The indictment sets forth ten predicate acts establishing a pattern of racketeering activity, including two conspiracies to take over competing gambling operations, threats and acts of violence including conspiracy to commit murder, operating a sports gambling business, operating a numbers gambling business, and financing extortionate extensions of credit. The indictment lists at least two overt acts to support each allegation for conspiracy to take over the Belli gambling business, conspiracy to take

over the Stumpo–Barbarulla gambling business, and conspiracy to commit the murder of Vincent Mistretta. Operating a sports gambling business, operating a numbers gambling business, and financing extortionate extensions of credit are also listed in separate counts as substantive offenses (Counts 4, 5, and 9).

Defendants Mylenki, Odierno, and Camiscioli are incorporated by reference in Count 2; however, the predicate acts for which they are named are nonviolent crimes, that is, Mylenki for sports gambling; Odierno for sports gambling; and Camiscioli for numbers gambling. Likewise, defendant Louis Gatto Jr. is named in Count 2 only for the nonviolent predicate act of operating a sports gambling business.

All eight defendants have moved for severance of his trial based on Rule 14 of the Federal Rules of Criminal Procedure.

The court notes initially that this indictment names fewer defendants and has fewer counts than the cases discussed *supra,* in which each district court severed the trials of certain defendants. *See Gambino,* 729 F.Supp. at 956–57, 970 (7 counts, 15 defendants); *Vastola,* 670 F.Supp. at 1251 (114 counts, 21 defendants); *Gallo,* 668 F.Supp. at 738 (22 counts, 16 defendants). Thus, the complexity of the trial here is not as extreme as the cases cited. Although the complexity of the trial increases as the number of counts and defendants in the indictment increases, this case presents neither double-digit defendants nor double-digit counts.

The indictment, however, charges more than one conspiracy. Count 1 charges a RICO conspiracy; Count 2 lists (1) conspiracy to take over the Belli gambling business as a racketeering act; (2) conspiracy to take over the Stumpo–Barbarulla gambling business as a racketeering act; and (3) conspiracy to commit the murder of Vincent Mistretta as a racketeering act. Each conspiracy involves different defendants in different combinations. Thus, the jury will be required to distinguish separate conspiracies and conspirators. As alleged members of the same conspiracy,

statements of one coconspirator would be conditionally admissible against all other defendants alleged to have participated in that conspiracy; thus, the jury may have to segregate or to remember over the course of a lengthy trial which statements were admissible against which defendant. Limiting instructions to the jury regarding what evidence was admissible against which defendant would be extraordinarily complex.

In making its determination on severance, the court must also consider "disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between the various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant." *Gallo,* 668 F.Supp. at 749.

A lengthy trial may prejudice those defendants against whom much of the evidence is not relevant simply by the " 'slow but inexorable accumulation of evidence' against the major players." *Id.* at 750. This prejudice would be especially acute for those defendants not charged with violent acts, since proof of the substantive RICO count includes, *inter alia,* acts of murder, beatings, and threats. Those defendants charged with operating gambling businesses that are predicate acts for the substantive RICO charge may be prejudiced by this evidence at a joint trial. Such prejudice is presented by the admission of coconspirators' statements made in the course of a conspiracy to commit a violent act, such as the murder of Vincent Mistretta, when a defendant was not a member of that conspiracy. Although admissible against some defendants, such statements would not be admissible against all defendants. Joint trial would put these statements before the jury and could prejudice defendants not charged with the conspiracy. This disparity in the degree of participation in the violent crimes charged as predicate acts substantially prejudices those defendants not charged with heinous acts. Nonetheless, if members of the enterprise,

these defendants may have acquiesced in the acts of violence or tacitly approved of such acts. Defendants have offered no evidence that any will present antagonistic defenses.

Three defendants are currently detained before trial. *See United States v. Gatto,* 727 F.Supp. 903 (D.N.J.1989). Thus, the length of detention before they may be proved guilty of any crime may be further extended by a prolonged trial. This factor weighs heavily in favor of expediting their trial by severing the trials of peripheral defendants.

This court has previously determined that severance of trials for defendants named in a substantive RICO count from those named in a RICO conspiracy count was not appropriate. *See Vastola,* 670 F.Supp. at 1261–62. *Cf. Gambino,* 729 F.Supp. at 970–71 (alleged coconspirators divided into two groups, one of which contained leaders of conspiracy who were active over its entire length and committed nearly all alleged acts of violence). In *Vastola,* the court reasoned that the government should not be prevented from prosecuting those cases that the RICO statute was intended to combat. *Vastola,* 670 F.Supp. at 1262. Additionally, the similarities in proofs for the substantive RICO and RICO conspiracy counts substantially overlap. Alleged participants in a conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even when the quantum of evidence against each defendant varies widely. *See United States v. Ward,* 793 F.2d 551, 556 (3d Cir.1986). Nonetheless, the rationale of judicial efficiency that supports joint trial of coconspirators is not met when the size of the conspiracy is so large that trial consumes months and months of the court's schedule.

Here, the government estimates that its case will take three months to present. Defendants estimate that the complete trial will take over a year. The court is extremely reluctant to ask jurors to spend the next year serving in federal court because such service causes an enormous disruption in their lives. This disruption may distract

from the jury's ability to devote its full attention to the trial and to render a fair verdict. This court may also consider judicial administration in determining whether to sever the trial of certain defendants. A lengthy trial would necessitate adjournments and cause delays in this court's already overloaded civil and criminal calendar. Although severing a conspiracy trial may require the presentation of duplicative evidence, the pace of later trials would quicken with the government's and the court's familiarity with the case. *See Gallo*, 668 F.Supp. at 757.

The court is also concerned about the potential for prejudicial spillover from the government's case against defendants Louis Gatto Sr., Alan Grecco, Stefano Mazzola, and Joseph Gatto. These defendants are named in racketeering acts that include acts of violence, such as conspiracy to commit murder and extortionate collections of credit. Defendants Louis Gatto Jr., Odierno, Mylenki, and Camiscioli, however, are named only as managers in the sports or numbers gambling businesses. The court finds that a lengthy trial that requires proof of violent crimes may prejudice the defendants not charged with violent crimes.

The court concludes that, due to the multiple conspiracies charged in the indictment, the jury may be unable to compartmentalize the evidence against each defendant for each conspiracy. Additionally, because the lengthy joint trial of this case would cause extreme hardship to the court, the jury, the defendants, and counsel, and because those defendants not charged with violent predicate acts may be prejudiced by substantial proof of violent acts by codefendants, this court will sever the trials into two group trials. The first group will consist of defendants Louis Gatto Sr., Alan Grecco, Stefano Mazzola, and Joseph Gatto. The second group will consist of defendants Louis Gatto Jr., Odierno, Mylenki,

and Camiscioli. Severance along these lines will permit expedited trial of all defendants currently detained before trial. Additionally, those defendants charged with violent predicate acts will be segregated from those defendants who are not, minimizing the potential for prejudicial spillover. While the court recognizes that such a severance may require some duplicity, in a complicated, multi-count, multidefendant RICO and RICO conspiracy trial, such a severance may serve judicial economy and improve the likelihood that the jury will return a fair verdict.

### 2. Need for Exculpatory Testimony

Defendants Camiscioli and Grecco also move for severance of their trials based on the need for codefendants' testimony that purportedly will exculpate them. Defendants Louis Gatto Sr., Joseph Gatto, and Louis Gatto Jr. ("Gatto defendants") join in all motions of defendant Grecco;[2] presumably, they each assert the need for the exculpatory testimony of a codefendant.

Persons who are properly joined in an indictment generally are to be tried together, particularly if conspiracy is charged, so that the full extent of the conspiracy may be developed. *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). Severance of trials may be required, however, where one defendant's testimony will exculpate a codefendant. Where a motion for severance is based on the asserted need for a codefendant's testimony, the moving defendant must establish (1) a bona fide need for the testimony of his codefendant, (2) the likelihood that the codefendant would testify at a second trial and waive his fifth amendment privilege, (3) the substance of his codefendant's testimony, and (4) the exculpatory nature and effect of such testimony. *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56

---

2. Louis Gatto Sr., Joseph Gatto, and Louis Gatto Jr. all join in defendant Grecco's motions. Throughout the opinion the court will refer to these duplicative motions as "defendants' motions" even though Grecco alone has raised the argument. In doing so, the court will consider the facts of each defendant's contention, although the language of the opinion may suggest that all defendants stand in the same shoes. To the extent a particular motion is inapplicable to the other defendants, the court will refer to Grecco specifically.

L.Ed.2d 411 (1978). Once defendant has made such a showing, the court must (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) assess the extent of prejudice caused by the absence of the testimony; (3) pay close attention to judicial administration and economy; (4) give weight to the timeliness of the motion; and (5) consider the likelihood that the codefendant's testimony could be impeached. *Provenzano,* 688 F.2d at 199; *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.1980).

To satisfy the requirement to show that the codefendant would testify and waive his fifth amendment privilege at a severed trial, the movant is not required to establish such willingness to "an absolute certainty;" he need only show "[a] reasonable probability ... that the proffered testimony would, in fact, materialize...." *United States v. Shuford,* 454 F.2d 772, 778 (4th Cir.1971). The requirement of a showing of willingness to testify if there is a severance is *not* met when that offer to testify is conditioned on the codefendant's case being tried first. *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir.1983) (no severance required where codefendant did not testify in own defense); *United States v. Frazier,* 394 F.2d 258, 261 (4th Cir.) (gamble that codefendant would "throw [defendant] a bone by way of alibi" insufficient), *cert. denied,* 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968) (condition that codefendant be tried first vitiates good faith of the proffer).

The requirement that the movant establish the "exculpatory nature and effect" of the codefendant's testimony demands more than a "vague and conclusory statement of counsel of facts of purely cumulative or negligible weight or probative value," *Parodi,* 703 F.2d at 780; the showing must be sufficiently definite for a determination by the trial court of the testimony's exculpatory nature and effect. *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980) (testimony not so clearly exculpatory to justify midtrial severance). The showing must be such as to establish that the moving defendant "will be unable to obtain a fair trial without severance, not merely that a separate trial would offer him [or her] a better chance of acquittal," *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977), or to offer evidence that "merely contradicts part of the Government's proof." *United States v. West,* 670 F.2d 675, 680 (7th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). The trial court must also assess the "degree to which the testifying co-defendant could be impeached." *United States v. Provenzano,* 688 F.2d at 199. Finally, the court must consider judicial economy and timeliness of defendant's motion.

Applying these factors to the individual defendants, the court finds that no defendant has met his burden to show that this court must sever his trial to permit a codefendant's testimony that would exculpate him. Defendants Camiscioli, Louis Gatto Sr., Joseph Gatto, and Louis Gatto Jr. have failed to make a bona fide showing of the need for the testimony of a codefendant. The court will deny their motions to sever on this basis. Defendant Grecco contends that Joseph Gatto can exculpate him from charges that he threatened Stumpo or that he attended a meeting at which the murder of Arthur Belli was planned. Grecco has failed to establish, however, any likelihood that Joseph Gatto would waive his fifth amendment privilege to testify at a second trial for Grecco. While the substance of such testimony shows it would be exculpatory, Grecco has not met his initial burden to show there is a reasonable probability that Joseph Gatto would testify at separate trials. Thus, this court need not consider whether Joseph Gatto is impeachable. Grecco's motion for severance of his trial will be denied on the basis of the need for a codefendant's exculpatory testimony.

## B. *Motions Attacking the Indictment*

### 1. Motion to Strike Violent Acts from Indictment

 Defendant Grecco and the Gatto defendants argue that this court should strike from the indictment any reference to

homicides and other violent acts because the charges are brought in bad faith by the government, are stale, and severely prejudice defendants' ability to obtain a fair trial. They maintain that the government deliberately delayed the indictment to prejudice defendants by the absence of potential alibi witnesses through death or unavailability and that such prejudice substantially outweighs the probative value of such evidence.

Defendants contend that the allegations of violent acts are brought in bad faith because they have nothing to do with the central charge of gambling; therefore, this court must strike the acts of violence from the indictment. (citing *United States v. Aiken*, 373 F.2d 294, 299 (2d Cir.), *cert. denied*, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967)). *Aiken*, however, stands for the proposition that, where joinder of offenses is originally proper under Rule 8(b) of the Federal Rules of Criminal Procedure, a motion for severance after dismissal of the count justifying joinder will not be granted unless defendant is prejudiced by joinder or the count dismissed was not alleged in good faith, that is, with reasonable expectation that sufficient proof would be forthcoming at trial. *Id.* The case in no way supports striking the violent acts from the indictment for charges brought in bad faith. Even if *Aiken* stood for this proposition, defendants have not shown that the government brought the charges without reasonable expectation that sufficient proof would be forthcoming at trial to link the violent acts with the gambling operations. In fact, the prolonged detention hearings in this case show that the government has adequate evidence to support a reasonable expectation that sufficient proof will be presented at trial. *See United States v. Gatto*, 727 F.Supp. 903, 915 (D.N.J.1989) (evidence of dangerousness is clear, convincing, and overwhelming). At the detention hearings, the government presented evidence that violent acts were committed to accomplish the takeover of competing gambling businesses; this nexus sufficiently links the acts of violence to the central charge of gambling to warrant inclusion of the violent acts here. The government also presented evidence that Vincent Mistretta was murdered to prevent his becoming an informant against defendants, thereby protecting the gambling business from law enforcement. This nexus likewise connects the allegations of violence to the gambling business.

In the alternative, defendants argue that they are severely prejudiced by the delay of the government in returning an indictment on these acts of violence; thus, the court must dismiss the indictment. The due process clause of the fifth amendment may require dismissal for preindictment delay where the delay is an intentional device to gain tactical advantage over the accused. *See United States v. Marion*, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971) (due process claims premature where no actual prejudice alleged and no showing that government intentionally delayed to gain tactical advantage). Defendants here claim that preindictment delay gives the government a tactical advantage because witnesses who could exculpate them are dead or otherwise unavailable; therefore, they are substantially prejudiced. The United States Supreme Court, however, has stated that, while prejudice is an element of a claim for due process violation by preindictment delay, it is not necessarily sufficient evidence of a due process violation. *See United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977) (due process inquiry into reason for delay). Rather, the court must consider the reason for the delay; a good faith investigative delay does not violate due process. *Id.* at 790–91, 97 S.Ct. at 2049. The Court noted that a prosecutor abides by the elementary standards of "fair play and decency" by refusing to seek indictments until he or she "is completely satisfied that he [or she] should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* at 795, 97 S.Ct. at 2051.

Here, the government has offered evidence that defendants' intimidation of witnesses caused the delay in prosecuting the violent acts. Thus, the government has not

delayed the indictments to gain a tactical advantage; rather, the government contends it refused to seek an indictment until the prosecutor was satisfied that the government could obtain a conviction. Delay caused by the government's carefully building its case from the testimony of reluctant witnesses does not offend this court's notion of fair play and decency. Additionally, defendants have failed to show that the unavailable witnesses could have provided any relevant evidence; thus, any prejudice is potential and not actual. The court will deny defendants' motion to dismiss the indictment or to strike alleged violent acts from the indictment for preindictment delay.

Finally, defendants contend that the court should strike the allegations of violent acts because the prejudice to defendants caused by the introduction of such evidence far exceeds the probative value under Rule 403 of the Federal Rules of Evidence. Defendants contend that the government should not be permitted to refer to such acts in its opening argument because such evidence will not be admissible. The violent acts, however, are the predicate racketeering acts for the substantive RICO count. As such, these acts represent an element of the RICO offense. The court rejects this utterly meritless argument.

2. RICO's "Pattern of Racketeering" Requirement is Unconstitutionally Vague

▇▇▇ Defendants contend that the RICO statute is unconstitutionally vague because the pattern of racketeering requirement is not defined with sufficient clarity to place defendants on notice as to what conduct is proscribed, citing *H.J., Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 2909, 106 L.Ed.2d 195 (1989) (Scalia, J., concurring) ("today's meager guidance bodes ill for the day when [a constitutional] challenge is presented").

The United States Supreme Court considered the "pattern of racketeering" requirement in the context of a civil RICO action in *H.J., Inc. v. Northwestern Bell*

*Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J., Inc.,* the Supreme Court held that the district court erred in dismissing for failure to state a cause of action a civil RICO challenge to Northwestern Bell's alleged scheme to bribe members of a state public utility commission to obtain favorable rate rulings. *Id.* 109 S.Ct. at 2906. The *H.J., Inc.* Court explained that to prove RICO's "pattern of racketeering, a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 2900 (emphasis in original). The Court stated that evidence of multiple schemes of criminal conduct is highly probative of the continuous nature of defendant's criminal conduct, but that multiple schemes are not a necessary element of a RICO pattern. *Id.* at 2901. According to the Court, a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Id.* at 2902. For example, the Court noted that the threat of continuity is sufficiently established where the predicate acts can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. *Id.* A pattern may also be established through proof that predicate acts forming a single criminal scheme were "a regular way of conducting defendant's ongoing legitimate business." *Id.* The Court found that plaintiffs might be able to prove a pattern of racketeering that Northwestern Bell gave five members of the commission numerous bribes over the course of six years with the objective of causing these commissioners to approve unfair rates because the acts of bribery are related by a common purpose and the predicates occurred with some frequency over a six year period. *Id.* at 2906.

The United States Court of Appeals for the Third Circuit recently applied the teachings of *H.J., Inc.* in *United States v. Pungitore,* 910 F.2d 1084 (3d Cir.1990). In *Pungitore,* the Third Circuit soundly rejected appellants' contention that they lacked notice that their conduct, which included

murder, extortion, illegal gambling, and usury offenses, constituted a "pattern" under RICO as "utterly devoid of merit." 910 F.2d at 1104. The Third Circuit noted that a statute is unconstitutionally vague when it "either forbids or requires the doing of an act in terms so vague that [persons] of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Id.* at 1104 (citing *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). The court stated that it need not consider whether the pattern requirement was unconstitutionally vague if it first found that persons of ordinary intelligence would know that repeated commission of murder, extortion, gambling, and usury offenses in furtherance of an organized crime enterprise constituted a pattern of racketeering activity under RICO. *Id.* at 1104. The court found that appellants' activities clearly met the "relationship plus continuity" test for a pattern because the conduct extended over a substantial time and the predicate acts were related because they were committed in furtherance of the affairs of the enterprise. *Id.* at 1104–1105.

This court finds no distinction between *Pungitore* and the case at bar. The threat of continuity is sufficiently established here because the alleged predicate acts of murder, extortion, illegal gambling can be attributed to defendants' operating as part of a long-term association that exists for criminal purposes. As in *Pungitore*, defendants here allegedly "have engaged in a classic pattern of racketeering under RICO" such that their contention that they lack notice that such conduct was proscribed is without merit. *Id.* at 1105. Defendants' *motion to dismiss the indictment* because RICO is unconstitutionally vague will be denied.

3. Motion to Strike Prejudicial Surplusage

■ Under Rule 7(d) of the Federal Rules of Criminal Procedure, this court may strike surplusage from the indictment upon defendant's motion. Fed.R.Crim.P. 7(d); *United States v. Moya–Gomez*, 860 F.2d 706, 762–63 (7th Cir.1988) (court may strike superfluous language that unfairly prejudices accused). The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in the indictment. *United States v. Fahey*, 769 F.2d 829, 841–42 (1st Cir.1985); *United States v. Ramirez*, 710 F.2d 535, 544–45 (9th Cir.1983).

> A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.

*Vastola*, 670 F.Supp. at 1254 (quoting *Dranow v. United States*, 307 F.2d 545, 558 (8th Cir.1962)).

Defendants maintain that reference in the indictment to aliases and the "Gatto group" severely prejudices them. Defendant Mazzola moves to strike the entire preamble to the indictment, which refers to the Gatto group as part of the Genovese crime family, LaCosa Nostra, or Mafia. Mazzola also moves to strike "catch-all" phrases, such as "elsewhere," "others," and "among others" because such terms permit the jury to infer that defendants were involved in activities not charged in the indictment. *United States v. Hubbard*, 474 F.Supp. 64, 82–83 (D.D.C.1979) ("various," "among other things," "at least," "besides the defendants," and "and related matters" stricken). Curiously, defendants also request that this court strike reference to the murder of Vincent Mistretta, threats and violence, and the murder of Arthur Belli as prejudicial surplusage. Likewise, Mazzola contends that the government can not show that the attack on him was staged and, therefore, all references to the attack *must be stricken.*

a. Reference to the "Gatto Group" and "Genovese Crime Family"

■ In *United States v. Vastola*, 899 F.2d 211, 232 (3d Cir.1990), *vacated on other grounds*, —— U.S. ——, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990), the United

States Court of Appeals for the Third Circuit held that reference to the "Vastola Organization" in the superseding indictment did not convey any prejudicial information to the jury that was not already demonstrated by the government's evidence. *Id.* The court recognized that the government's naming of the enterprise after one of the defendants had the potential for prejudice, as would identification of a defendant by a damaging alias. *Id.* The court noted that the risk for unfair prejudice is greatest where the defendant is only loosely affiliated with the enterprise because, in such circumstances, a jury could infer an essential element of the RICO offense, that is, participation in the enterprise, from the unsupported allegations in the indictment. *Id.* The Third Circuit nonetheless found that the evidence clearly showed that Vastola was in charge of the organization because the majority of the enterprise's illegal loans were subject to Vastola's approval and that coconspirators understood other key players to be "Vastola's people." *Id.* In light of the evidence in the record, the court found that the district court's refusal to issue a cautionary instruction to the jury not to consider the enterprise's name as evidence of guilt was at most harmless error. *Id.* The court suggested, however, that redacting the indictment or delivering a specific instruction cautioning the jury not to consider the enterprise's name as evidence of guilt "might very well be appropriate." *Id.*

Here, the government does not oppose redacting the indictment to delete the phrase "Gatto group," suggesting "criminal enterprise" as a substitute. Given the Third Circuit's caution in *Vastola*, this court finds the safest course of action is to order that the government redact the indictment to exclude the phrases "Gatto Group." Substituting the phrase "criminal enterprise" will remove the potential for unfair prejudice and preclude the need for cautionary instructions. The court, however, finds no prejudicial connotation in the word "Group." The jury could not infer guilt of a particular defendant from the term "Group;" therefore, the court will deny defendants' motion to strike the term from the indictment.

Defendants also argue that reference in the preamble to LaCosa Nostra, the Mafia, and the Genovese crime family is prejudicial and inflammatory. This court, in dicta, has previously noted that the function of a preamble in the indictment "should be to serve as a guide to what is alleged in the counts that the jury will actually evaluate. It should not contain additional information to what is alleged in the counts, nor should it contain terminology that carries with it connotations of culpable behavior." *Vastola*, 670 F.Supp. at 1255 ("and with others," "and others," "and other criminal means" stricken).

The determinative question, however, is the relevance of the challenged references to the crime charged in the indictment. *United States v. Giovanelli*, No. S 88 Cr. 954 (CBM) 1989 WL 49245 (S.D.N.Y. May 2, 1989) (available at 1989 U.S.Dist. LEXIS 4438). An indictment may properly include any allegation that is "relevant to the case and will constitute part of the government's proof at trial." *United States v. Persico*, 621 F.Supp. 842, 860 (S.D.N.Y.) (quoting *United States v. Esposito*, 423 F.Supp. 908, 911 (S.D.N.Y.1976)), *aff'd*, 774 F.2d 30 (2d Cir.1985).

Evidence regarding the hierarchy of control within an organized crime family may clarify the structure of the enterprise. *United States v. Rastelli*, 653 F.Supp. 1034, 1056 (E.D.N.Y.1986) (defendant's description as "capo" properly included in indictment). The indictment here alleges that Louis Gatto Sr. is a Capo in the Genovese crime family. The government contends that it will present evidence that the criminal enterprise was a faction of the Genovese crime family and that much of their power came from that criminal association. Such evidence would be relevant to show the structure of the criminal enterprise alleged in the indictment. The court will reserve judgment pending the close of the government's case whether the government has shown sufficient nexus between the criminal enterprise alleged here and the Genovese crime family.

### b. Aliases

■■■ Generally, the inclusion of an alias, even one with a strong negative connotation, is permissible if needed to connect the accused to the acts charged. *Persico*, 621 F.Supp. at 860–61 (even prejudicial nicknames and aliases proper if part of government's proof at trial). In *Persico*, the United States District Court for the Southern District of New York refused to redact the indictment before trial, reasoning that the aliases might be integral to the government's case because the primary evidence consisted of wiretaps in which defendants referred to one another by their aliases. *Id.* The court stated that it would consider redacting the indictment at the close of the government's evidence if the government had failed to introduce proof of the aliases. *Id.*

The indictment here names two aliases: Louis Gatto Sr. a/k/a "Streaky" and Alan Grecco a/k/a Alan Wolshonak. The court notes initially that Alan Wolshonak is not an alias but was the defendant's original legal name; he legally changed that name from Wolshonak to Grecco. Second, the name "Grecco" carries with it no prejudicial connotation. Finally, the name is needed to connect Grecco to one of the crimes charged, that is, the murder of Vincent Mistretta. According to the government, Mistretta's dying words were "Al Wolshonak did it." The court finds no reason to strike this "alias" from the indictment.

As for Louis Gatto Sr., the court agrees with the *Persico* court that the alias "Streaky" might be integral to the government's case; thus, striking the alias pretrial is inappropriate. As in *Persico*, the government intends to introduce evidence consisting of wiretaps in which defendants may refer to one another by aliases. This court will consider redacting the indictment at the close of the government's evidence, upon defendant's motion, if the government fails to introduce proof of the alias. *See id.*

### c. "Catch-all" Phrases

■■■ This court has previously stricken vague language from an indictment where the language is not specifically relevant to all the crimes alleged because such terms may permit the jury to draw improper inferences. *Vastola*, 670 F.Supp. at 1255 (terms such as "various," "among other things," and "at least," stricken from indictment). Such terminology implies that defendants committed crimes not charged in the indictment, allowing the prosecution to enlarge impermissibly the allegations in the indictment. *United States v. Fahey*, 769 F.2d 829, 842 (1st Cir.1985) (terms such as "numerous," "among other things" not stricken because not prejudicial). "Anything in the indictment that allows the jury to infer involvement with uncharged crimes ... is improper." *Vastola*, 670 F.Supp. at 1255 (citing *United States v. DeFabritus*, 605 F.Supp. 1538, 1547 (S.D.N.Y.1985); *United States v. Hubbard*, 474 F.Supp. 64, 82–83 (D.D.C.1979)). Nonetheless, terms that are not used in a prejudicial or misleading fashion are not properly stricken. *Fahey*, 769 F.2d at 842. The court, therefore, must make an initial determination whether the challenged terminology refers to crimes charged in the indictment and whether such use is prejudicial.

The term "elsewhere" appears throughout the indictment. In each count and each predicate racketeering act, the government contends that defendants acted in the District of New Jersey and "elsewhere." Thus, the term relates to specific charges in the indictment. The term may be prejudicial if it implies a broader scope of illegal activity than actually alleged in the indictment. This analysis applies equally to the term "others." The government contends that it will present evidence that seventy others were employees or coconspirators. Defendants, however, would be prejudiced by the inclusion of these terms in the indictment if the government fails to show involvement of other persons or conduct taking place outside the District of New Jersey because the terms suggest a broader participation in illegal conduct.

This court has previously stricken terms such as "and others" without foreclosing the government from presenting any proof relevant to the charges at trial. *See Vasto-*

*la,* 670 F.Supp. at 1256–57 (defendant's motion to strike surplusage granted in part). Other courts have reserved decision until the close of the evidence. *See Fahey,* 769 F.2d at 842 (court reserved decision until close of evidence). Reserving until the close of the government's case, however, permits the jury to hear the terms during the court's recitation of the indictment at the opening of the case. *See Vastola,* 670 F.Supp. at 1255. If the court later determines that the terms are irrelevant and should be stricken from the indictment, the prejudice to the defendants could not be undone. *Id.* The court, therefore, will strike the reference in the indictment without foreclosing the government's ability to present such evidence.

### d. References to Acts of Violence

■■■ Finally, defendants move to strike references to the Mistretta murder, the attack on Mazzola, allegations of threats and violence, and racketeering acts as objectionable terms. The Mistretta murder, threats to those in competing gambling businesses, and threats to those owing credit to the group all appear as predicate acts for the substantive RICO count. The terms are clearly relevant to the charges in the indictment. The jury could not possibly infer involvement with uncharged crimes because these crimes are charged in the indictment. The court, therefore, can perceive no prejudice to defendants.

Likewise, the court will not strike the term "racketeering" from the indictment. The word "racketeering" is a statutory term and is used throughout the indictment in a reasonable manner. *See Vastola,* 670 F.Supp. at 1255. The challenge to its use is without merit.

The reference in the preamble to the indictment to the staged attack on defendant Mazzola is a different matter. The preamble to the indictment states:

> The Gatto Group used force and violence to establish a climate of fear and to obstruct law enforcement. To that end, members of the group murder Vincent Mistretta, whom they suspected was providing information about the Gatto group to law enforcement. Additionally, they staged what appeared to be a violent attack on defendant Stefano Mazzola, who was then a police officer, so that a Group associate could appear to rescue Mazzola and thus receive favorable treatment on a subsequent criminal sentence.

Indictment ¶ 1(g), at 4. Notably, the staged attack is not alleged to be a predicate racketeering act in the indictment nor is it alleged to be an overt act in furtherance of any conspiracy alleged in the indictment. Additionally, the indictment fails to specify how the staged attack allegedly furthers the purposes of the enterprise. The information is prejudicial and inflammatory. The allegation implies that the attack was "staged" for an improper purpose. The act involves used of deadly weapons. At the time of the alleged incident, Mazzola was a police officer required to uphold the law. The conduct, however, was not charged in the indictment as either a substantive offense, a predicate act, or overt act in furtherance of a conspiracy. The preamble should not contain information beyond what is alleged in the counts, nor should it contain terminology that carries with it connotations of culpable behavior. *Vastola,* 670 F.Supp. at 1255.

The government argues that evidence of the attack is admissible to show the relationship between a key government witness and the defendants. Whether or not evidence about the attack is admissible, however, is immaterial to the determination whether such information is properly included in the indictment; the court rejects the government's attempt to equate admissibility of evidence with proper inclusion in the indictment. The court need not, at this time, consider whether evidence of such acts is prohibited by Rule 404(b) of the Federal Rules of Evidence (evidence of extrinsic acts to prove propensity for crime) or whether such evidence is unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. The court finds, however, that the government's reference to the staged attack on Mazzola in the preamble of the indictment improperly includes allegations not charged in the counts. The information is both prejudicial and inflam-

matory; thus, this court will order that the information be stricken from the preamble to the indictment.

Defendants' motions to strike surplusage from the indictment, therefore, will be granted in part and denied in part.

### 4. Motion to Dismiss Counts Charging Multiple Offenses

■ Defendant Grecco moves to dismiss the indictment because Count 1 alleges, and the remaining counts incorporate by reference, both sports gambling offenses and numbers gambling offenses. Defendants argue that, because different facts must be proven for each offense, a jury could find a defendant guilty of one offense but not the other, yet a general verdict would not reflect the acquittal.

Racketeering conspiracies, however, often embrace diversified activity involving many different crimes. *See United States v. Turkette*, 452 U.S. 576, 588, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) (arson, mail fraud, and bribery used for purpose of illegally trafficking in narcotics); *United States v. Riccobene*, 709 F.2d 214, 229 (3d Cir.) (loansharking, mail fraud, and gambling), *cert. denied sub nom., Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The court can mold a proper verdict that is sufficiently clear for appellate review by providing the jury special interrogatories as to the predicate racketeering acts. Defendants' motion to dismiss the indictment on this basis, therefore, will be denied.

### 5. Motion to Dismiss Count One for Failure to Specify Predicate Acts

■ Defendants move to dismiss Count 1 of the indictment, the RICO conspiracy count, because it fails to specify predicate offenses that defendants are alleged to have committed. Rather, Count 1 provides that the pattern of racketeering activity was "of the type" alleged in Count 2.

The United States Court of Appeals for the Third Circuit recently approved of an indictment's general identification of the acts underlying a RICO conspiracy charge and held that the government could rely on any act of bribery and extortion, even beyond those set forth as racketeering acts in Count 2 of the indictment, so long as that act occurred within the time frame of the conspiracy and was established by proofs at the trial. *United States v. Phillips*, 874 F.2d 123, 130 (3d Cir.1989). Count 1 alleged the elements of a RICO conspiracy under 18 U.S.C. § 1962(c) stating that "defendants conspired to commit 'multiple' acts of bribery in violation of [state law] and extortion in violation of [federal law]," but failed to specify with particularity which acts of bribery and extortion defendants agreed to commit. *Id.* at 125, 127 n. 4. The *Phillips* defendants attacked the indictment arguing that Count 1 was merely the conspiracy analogue to the substantive offense charged in Count 2; thus, the government had to prove that defendants agreed to commit two or more of the predicate acts set forth in Count 2 and was precluded from proving other acts to support the conspiracy charge. *Id.* at 127.

The Third Circuit acknowledged that it was troubled by the sufficiency of the conspiracy charge because it failed to specify with particularity which acts of bribery and extortion defendants allegedly agreed to commit. *Id.* at 127 n. 4. Nonetheless, the court found that the indictment sufficiently apprised defendants of the charges against them and protected them against future double jeopardy problems. *Id.* (citing *United States v. Kenny*, 462 F.2d 1205, 1214 (3d Cir.) (indictment charging underlying elements of crime by reference to statutory violations of extortion and bribery not vague under fifth and sixth amendments), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 234, 34 L.Ed.2d 176 (1972)). The court noted, however, that the other deficiencies in the indictment were waived by defendants' failure to appeal the denial of their request for a bill of particulars. *Id.* at 128 n. 5. Notwithstanding the generality of Count 1's language, the court reluctantly followed its prior decision in *Kenny* and held that, to support the conspiracy convictions, the jury must find that:

> each defendant knowingly and willfully agreed to join a conspiracy with knowl-

edge of its goals and knowledge that at least two acts of racketeering *of the type described in the indictment* (*i.e.*, bribery under state law and extortion under federal law) would be performed by some member(s) of the conspiracy.

*Id.* at 128 (quoting district court's slip opinion) (emphasis added).

The *Phillips* case is distinguishable from the case at bar. In *Phillips*, the conspiracy count specifically referred to two types of predicate acts that supported the conspiracy charge, that is, bribery or extortion; thus, the government could properly present evidence of *any* bribery or extortion offense during the period of the conspiracy in addition to its evidence of the racketeering acts charged in Count 2. Thus, defendants were on notice of the conduct that the government sought to prove; the racketeering acts plus other acts of bribery and extortion. Here, the conspiracy charge refers only to acts "of the type" in Count 2. Count 2 alleges racketeering acts including two conspiracies to take over gambling businesses, conspiracy to commit murder, sports gambling, numbers gambling, and extortionate financing of credit, and extortionate collections of credit. The court finds that reference to acts "of the type" in Count 2 is so broad and general as to fail to give defendants notice of the charges against them. While *Phillips* permits the government to prove other acts to support conspiracy beyond those listed as racketeering acts, the government can not expand that scope indefinitely. Given the Third Circuit's hesitance in *Phillips*, this court will not extend that holding to a case in which the government fails to specify any type of acts in the conspiracy count. An indictment is sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he [or she] must defend, and, second, enables him [or her] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (citing *United States v. Debrow*, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953); *Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932)). The language of Count 1 charging defendants with conspiracy to participate "in the conduct of the affairs of the ... Group through a pattern of racketeering of the type alleged in Count Two ... and through the collection of unlawful debts" fails to meet this standard.

This defect can be cured by granting in part defendants' request for a bill of particulars. Defendant Grecco requests that the government set forth the dates of all meetings, names of all persons murdered, and the dates and places of each murder or extortionate act in which defendant allegedly participated and the specific dates of the alleged conspiracy. The government must generally identify what "types" of acts, beyond the collection of unlawful debts, support the charge of conspiracy. *See infra* at section (D)(5) (government must specify names of participants in alleged offenses and specific dates and locations of alleged acts). Failure to do so will restrict the government to proofs of the specific racketeering acts listed in Count 2. *See United States v. Neapolitan*, 791 F.2d 489, 504 (7th Cir.) (instruction to jury that "any act" of selling stolen parts in interstate commerce could be predicate act is not plain error), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

6. Motion to Dismiss Count Two because Predicate Acts are Not Related to Objectives of the Enterprise

In *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the United States Supreme Court held that proof of two acts of racketeering activity, without more, does not establish a "pattern" of racketeering under RICO. *Id.* The Court explained that the legislative history supported the view that two isolated acts of racketeering activity do not constitute a pattern; rather, "[t]he infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a

pattern." *Id.* The Court noted that the Congress, in a later provision of the same bill, provided that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (citing 18 U.S.C. § 3575(e)).

Here, the indictment alleges that the racketeering acts shared the same purpose, that is, to establish and to sustain the illegal sports and numbers gambling businesses. The primary objective of the group, according to the indictment, "was to obtain money for its members and associates through the operation of two illegal gambling businesses." Count 1, ¶ (1)(e). This court finds that the alleged racketeering acts furthered the group's purpose by either (1) eliminating competing gambling businesses; (2) murdering those presenting a threat to the gambling businesses by becoming informants to law enforcement; and (3) collecting gambling debts to obtain money for the group's members.

Racketeering patterns may consist of diversified activities. *See, e.g., United States v. Turkette,* 452 U.S. 576, 588, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) (arson, mail fraud, and bribery used for purpose of illegally trafficking in narcotics); *United States v. Persico,* 832 F.2d 705, 708 (2d Cir.1987) (extortion, bribery, loansharking, and drug trafficking), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Riccobene,* 709 F.2d 214, 229 (3d Cir.) (loansharking, mail fraud, and gambling), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The court finds that the diverse racketeering acts alleged in the indictment nonetheless have a sufficiently related purpose to satisfy the relationship test of *Sedima.* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

To determine whether the continuity requirement is met, this court must consider "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of the victims, the number of the perpetrators, and the character of the unlawful activity." *United States v. Echeverri,* 854 F.2d 638, 649 (3d Cir.1988) (citing *Barticheck v. Fidelity Union Bank,* 832 F.2d 36, 40 (3d Cir.1987)). "[I]f the facts of a particular case show 'criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a significant period of time,' that activity has the kind of continuity contemplated by the pattern requirement." *Id.* (quoting *Marshall–Silver Construction Co. v. Mendel,* 835 F.2d 63, 66–67 (3d Cir.1987), *vacated and remanded in light of H.J., Inc.,* ── U.S. ──, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989)).

The racketeering acts, according to the indictment, span seventeen years; the alleged sports and numbers gambling businesses began in 1973 and 1974 respectively and continued at the time of the indictment. As such, the activity presented a threat of injury over a significant period of time. The racketeering acts were connected by a common purpose, that is, to establish and to sustain these gambling businesses. The similarity of the alleged extortionate collections of credit from Howard Clarke in 1982, Anthony Stumpo in 1983, and Robert Lipani in both 1977 and 1983 demonstrates the continuing and repetitious nature of the racketeering activities.

The indictment alleges ten racketeering acts; thus, the number of unlawful acts is not insignificant. Additionally, the number of the victims, including Clarke, Stumpo, Lipani, Arthur Belli, Max Belli, and Vincent Mistretta show the widespread effect of the racketeering acts. This court concludes that the racketeering acts alleged in the indictment satisfy the *Sedima* "continuity plus relationship" test; thus, this court will deny defendants' motion to dismiss Count 2 of the indictment.

7. Motion to Dismiss Indictment for Violating the Statute of Limitations

■ In *United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d

227 (1988), the United States Court of Appeals for the Second Circuit held that a substantive RICO charge is barred by the statute of limitations as to any defendant unless that defendant committed a predicate act within the five year limitations period. *Id.* (convictions under 18 U.S.C. § 1962(c) reversed). *See also United States v. Salerno,* 868 F.2d 524, 534 (2d Cir.) (conviction under 18 U.S.C. § 1962(c) reversed), *cert. denied,* —— U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); *United States v. Torrez–Lopez,* 851 F.2d 520, 525 (1st Cir.1988) (conviction under 18 U.S.C. § 1962(c) reversed), *cert. denied,* 489 U.S. 1021, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989). Defendant Grecco contends that the substantive RICO charge is barred by the statute of limitations because two of the alleged racketeering acts occurred in 1977, more than thirteen years ago. He argues that, because the racketeering acts are not continuous and are not related, the general rule that RICO is timely charged if at least one predicate racketeering act occurred within five years of the indictment does not apply here. Defendant does not cite any authority for this novel proposition. In any event, the court has already determined that the racketeering acts *were* sufficiently continuous and related to allege a proper pattern of racketeering activity. *See supra* at section (B)(6). Thus, the general rule applies here. The court must examine only whether each moving defendant has been charged with a predicate act within five years of the indictment.

Grecco, Louis Gatto Sr., Joseph Gatto, and Louis Gatto Jr. are each named in Count 4 of the indictment, which alleges that each participated in an illegal sports gambling business that existed in 1973 and continued up to the date of the indictment. Clearly, the indictment alleges that each defendant committed a predicate act within five years of the date of indictment. Defendants offer no basis for asserting the statute of limitations defense; they do not even contend that they withdrew from the conspiracy. The court will, therefore, deny defendants' motion to dismiss based on the statute of limitations argument. The court will reconsider, upon defendants' motion, at the close of the government's evidence if the government fails to present any evidence that an individual participated in the enterprise within the statutory period.

Additionally, 18 U.S.C. § 1961(5) provides that a pattern of racketeering activity may include an act committed ten years after the commission of a prior act of racketeering. *Id.* Thus, acts occurring much more than five years before date of indictment may properly be charged as predicate acts. Defendants appear to argue that the government should have returned this indictment seven years ago and, therefore, this court should dismiss the indictment because defendants are entitled to repose. RICO's statute of limitations, however, demonstrates Congress's intent that a defendant's entitlement to repose would be disturbed if his or her conduct fell within the RICO statute. *See* 18 U.S.C. § 1961(5). The court finds no statute of limitations violation in the indictment's reference to acts occurring thirteen years ago.

■ Defendant Mazzola contends that both the RICO conspiracy charged in Count 1 and the substantive RICO alleged in Count 2 are barred by the statute of limitations as to him because he was incarcerated for a substantial period between 1984 to 1987. He contends that the racketeering acts alleged occurred before July 20, 1984, except for the allegation in Count 4 of the indictment that he unlawfully, willingly, and knowingly participated in the sports gambling business until the date of the indictment. Mazzola contends that a bill of particulars would disclose that the government can not show that he participated in the sports gambling business. The government contends that it will produce evidence that Mazzola continued to supervise the collection of gambling debts while in prison and after he was released.

The court finds that this matter is not appropriate for pretrial determination. *See United States v. Levine,* 658 F.2d 113, 121 (3d Cir.1981) (because dates of continuing violations or conspiracies can often be properly evaluated after development of evidence at trial, denial of motion to dismiss for statute of limitations claims not neces-

sarily an order formally and completely rejected before trial) (citing *United States v. Stone*, 444 F.Supp. 1254, 1256 (E.D.Wis.), aff'd, 588 F.2d 834 (7th Cir.1978)). The *Levine* court held that an order denying a motion to dismiss on statute of limitations grounds was not immediately appealable. *Id.* at 129. The court reasoned that, unlike the bar of double jeopardy, the statute of limitations is an affirmative defense that does not preclude trial because it presents only qualified relief for prosecutorial untimeliness. *Id.* at 128.

Here, Mazzola has presented facts that suggest that he did not commit any act within the five year period before the indictment, invoking the affirmative defense of the statute of limitations. The government contends it will present evidence that Mazzola participated in the sports gambling business during and after his incarceration, bringing him within the five year statute of limitations period. The court, therefore, will reserve judgment until the close of the government's evidence to determine whether the government has presented any evidence that the statute of limitations does not bar the substantive RICO charge against Mazzola.

■■■■ Mazzola's contention that the RICO conspiracy charge is also barred by the statute of limitations is a different matter. In *United States v. Persico*, 832 F.2d 705, 713 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), the United States Court of Appeals for the Second Circuit held that a RICO conspiracy offense is complete, thus commencing the running of the five year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned. *Id.* The defendant need not commit an act within the five year limitations period; the statute of limitations does not bar an action for RICO conspiracy against that individual if he or she continues as a coconspirator and another conspirator acted within the five year period. *Id.* Where the conspiracy continues into the limitations period, an individual conspirator can commence the running of the statute of limitations as to him or her

by affirmatively withdrawing from the conspiracy. *Salerno*, 868 F.2d at 534 n. 4 (citing *In Re Corrugated Container Antitrust Litigation*, 662 F.2d 875, 886 (D.C. Cir.1981)).

■■■■ A defendant's membership in a conspiracy is presumed to continue until he or she withdraws from the conspiracy by affirmative action. *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912). Mere cessation of the conspiracy is not sufficient to establish withdrawal. *United States v. De Peri*, 778 F.2d 963, 980 (3d Cir.1985), *cert. denied sub nom., Pecic v. United States*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Continental Group, Inc.*, 603 F.2d 444, 467 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). The burden of proving withdrawal rests with the defendant. *United States v. Gillen*, 599 F.2d 541, 548 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach coconspirators. *United States v. Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978). This burden is typically met by a full confession to authorities or communication to one's coconspirators that defendant has abandoned the enterprise and its goals. *United States v. Steele*, 685 F.2d 793, 803–04 (3d Cir.), *cert. denied sub nom., Mothon v. United States*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Thus, a conspiracy is presumed to continue after defendant's arrest unless the defendant makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose.

■■■■ Mazzola contends that he affirmatively withdrew from the conspiracy when he was incarcerated because he could no longer perform his duties as an enforcer. The court, however, finds that Mazzola has failed to show any affirmative action that would suggest he withdrew from the conspiracy; thus, the statute of limitations did not commence as to him when he was incar-

cerated in July 1984. Mazzola's analogy to *Steele,* in which defendant presented evidence that he had permanently severed his employment relationship with General Electric Company by resigning his position, is inapposite. In *Steele,* the Third Circuit held that defendant's resignation sufficed to notify his coconspirators that he abandoned the enterprise, its goals, and any claim to the conspiracy's benefits. *Id.* at 803–04. Mazzola's involuntary incarceration is not analogous to the *Steele* defendant's voluntary withdrawal from the conspiracy. The involuntariness of his incarceration precludes clear notice to his coconspirators that he abandoned the conspiracy; rather, his coconspirators could presume that the involuntary withdrawal was merely a short hiatus, rather than a repudiation of the conspiracy. That the effect of Mazzola's incarceration and the *Steele* defendant's resignation from his employment are somehow analogous is not material. Mazzola's conduct failed to give notice to his coconspirators that he had unequivocally abandoned the conspiracy.

The same analysis applies to Mazzola's contention that his incarceration was a "forced retirement" from the group that caused a severance of all ties to the conspiracy. Inasmuch as Mazzola has failed to show that he withdrew from the conspiracy, thereby commencing the running of the statute of limitations as to him, the court may consider the acts of his coconspirators in determining whether the statute of limitations bars the conspiracy charge. The court will deny Mazzola's motion to dismiss Count 1, the RICO conspiracy charge, against him as barred by the statute of limitations.

## C. *Motions In Limine to Bar Introduction of Certain Evidence*

### 1. Admissibility of Coconspirators' Statements

■ Defendant Grecco moves *in limine* to bar the admissibility of alleged coconspirators' statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence. He contends that the government can not meet its burden to show existence of a conspiracy or that statements were made in furtherance of a conspiracy. Each Gatto defendant has joined in Grecco's motion.

In a conspiracy trial, the government may offer the statements of the defendant's alleged coconspirators as evidence in its case-in-chief. Generally, a witness may not testify about statements made by another because such statements are hearsay and are, therefore, inadmissible as evidence. Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if the statement is made by a coconspirator of the person against whom the statement is offered and the statement is made during the course and in furtherance of the conspiracy. *Id.* Before permitting the jury to consider a statement over defendants' objection, the court must find that the government has presented evidence that there was a conspiracy involving the declarant and the defendant and the statement was made during the course and in furtherance of the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). The existence of a conspiracy and the defendant's involvement in it are preliminary questions of fact that, under Federal Rule of Evidence 104, must be determined by the court before such evidence can be admitted. The government must prove these preliminary questions of fact by a preponderance of the evidence. *Id.* at 176, 107 S.Ct. at 2779. This court may consider both the alleged co-conspirator's statements and proof *aliunde,* that is, independent evidence of the conspiracy, in making its preliminary determination that a conspiracy existed. *Id.* at 181, 107 S.Ct. at 2781.

Given the practicalities of the presentation of proofs in a conspiracy trial, this court has previously permitted the testimony about such statements here over a defendant's continuing objection to their admissibility, subject to this court's determination that the statements are admissible because they are not hearsay under Federal Rule of Evidence 801(d)(2)(E). Notably, the Supreme Court did not express an opin-

ion of the proper order of proof that trial courts should follow in concluding that the preponderance standard has been satisfied in an on-going trial. *Bourjaily v. United States*, 483 U.S. at 176 n. 1, 107 S.Ct. at 2779 n. 1. The Court of Appeals for the Sixth Circuit, however, has held that the court may make this determination at the close of the government's case-in-chief. *See United States v. Vinson*, 606 F.2d 149, 153 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). This court has often followed this same procedure. *See, e.g., United States v. Palmeri*, Crim. No. 78–297 (D.N.J. Mar. 20, 1979).

The court, therefore, will deny defendants' motion to exclude the statements of coconspirators, but will consider whether the statements are admissible at the close of the government's evidence in each trial.

### 2. Motion to Suppress Statements of Mylenki and Camiscioli

Defendant Grecco, joined by the Gatto defendants, moves to suppress the post-arrest statements of codefendants Mylenki and Camiscioli. At oral argument, the government represented to the court that it would not seek to introduce these statements in their direct case; therefore, the court will deny the motion as moot.

### 3. Motion to Suppress Post–Hypnotic Statements of Frank Galimi

 Grecco has moved to suppress statements made by Frank Galimi, an alleged eyewitness to the murder of Vincent Mistretta. Galimi's initial statements to police indicate that he recognized the two assailants but that he could not identify them. At that time, Galimi told police that the victim stated "Al Wolshonak did it." Law enforcement officers from the Bergen County Prosecutor's Office brought Galimi to Dr. Wagle, a psychiatrist, for the purpose of hypnotizing Galimi. Galimi's father also attended. During the session, Galimi stated that one of the assailants was Al Wolshonak (a/k/a Alan Grecco) and that he saw Wolshonak get into the passenger side of the vehicle fleeing the scene.

Grecco contends that Galimi's statements are not the product of personal knowledge and are, therefore, inadmissible under Rules 601 and 602 of the Federal Rules of Evidence. He also contends that Galimi's statements to the hypnotist are inconsistent with earlier statements to police and are unreliable. He argues, therefore, that the statements were made under suggestive circumstances that were likely to result in misidentification, thereby violating his due process right to a fair trial.

The government contends that Galimi's recollection of the Mistretta murder was not hypnotically refreshed; rather, Galimi merely pretended to be hypnotized to end police pressure on him to cooperate as the sole eyewitness to the Mistretta murder. The government claims that Galimi was reluctant to identify Grecco as the assailant because he feared for his own safety; therefore, he agreed to be hypnotized.

At an evidentiary hearing held on June 13, 1990, the government presented the testimony of Martin Orne, M.D., a professor of psychiatry at the University of Pennsylvania. Dr. Orne testified that he interviewed Galimi, Dr. Wagle, and Officer Ronald McGill and Lieutenant Alan Grieco of the Bergen County Prosecutor's Office. Evidentiary Hearing of June 13, 1990, Transcript at 42–43. Based on these interviews and the reports and records of the session, Dr. Orne concluded that Galimi was not actually hypnotized during the session. *Id.* at 43. To support this conclusion, Dr. Orne stated that, during the one and a half hour interview, Galimi gave a very accurate description, one not typically known by the general public, of his hypnosis and self-hypnosis while in the Marines. *Id.* at 44. According to Dr. Orne, Galimi described hypnosis in a way that he could not have if he were lying. *Id.* at 45. Dr. Orne stated that this experience would help Galimi determine, in the future, whether or not he was actually hypnotized but would not help Galimi to fake being hypnotized. *Id.* at 50.

Dr. Orne also testified that one factor that determines the degree of "hypnotizability" of an individual, even an individual

that is susceptible to hypnosis, is his or her willingness to be hypnotized. *Id.* at 22, 27. According to Dr. Orne, Galimi was sufficiently motivated to fake hypnosis and that, under the circumstances of Galimi's session with Dr. Wagle, his anxiety and fright made it "very, very unlikely" that Galimi would be hypnotized even if he had wanted to be, but Orne could not rule out the possibility that Galimi could be hypnotized in that state. *Id.* at 51.

Additionally, Dr. Orne testified that Galimi's description of the session, that is, "what he did, how he thought about things, what he said and how he thought out what a right answer would be" was precisely the same as that of subjects faking the state of hypnosis in a laboratory. *Id.* at 48–49. For example, Dr. Orne stated that Galimi clearly described his focusing on his father as a way of not focusing on the hypnotist. *Id.* at 48.

Dr. Orne also testified that he considered the statements of Dr. Wagle, who told Orne that it was very unlikely that Galimi was hypnotized during the session. *Id.* at 51. Orne acknowledged that, during their half-hour long discussion, he did not ask Wagle whether he had made any hypnotic suggestion to Galimi during the session. *Id.* at 139. He also considered his interview with Lieutenant Grieco, in which Lieutenant Grieco described that Galimi was not as relaxed as he should have been. *Id.* at 52. The doctor stated, however, that the interview with Galimi was much more compelling evidence that he was not hypnotized than the interviews with other persons present at the time. *Id.*

Finally, the doctor testified that the factors that may make a post-hypnotic suggestion ineffective include (1) that the individual is not sufficiently hypnotized, and (2) that the individual does not want to respond to the suggestion, for example, if the individual were frightened or the suggestion threatened his or her self esteem. *Id.*

at 54. He testified that post-hypnotic suggestions are most effective immediately after hypnosis and significantly decrease in effectiveness over time, *see id.* at 56, and that the likelihood that hypnosis would have an effect ten years in the future is "just almost impossible" and "approaches nil." *Id.* at 59, 61.

The government also presented the testimony of Frank Galimi. Galimi confirmed that he was able to hypnotize himself while in the Marines. Evidentiary Hearing of July 30, 1990, Transcript at 28. He stated that he pretended to be hypnotized when he visited Dr. Wagle, but he was too frightened at the time to reveal to anyone that he had seen Wolshonak (a/k/a Grecco) fleeing the murder scene. *Id.* at 61, 88–89. Galimi stated that he did not become hypnotized despite Dr. Wagle's efforts because he focused on his father. *Id.* at 91. In response to Dr. Wagle's questions, he stated that he could not be certain but, when he yelled out the window of the apartment on the night Mistretta was killed, he thought he saw Wolshonak (a/k/a Grecco) look up at him over Mistretta's body. *Id.* at 96, 108. Galimi testified that he only partially lied to the hypnotist because he was certain that he saw Wolshonak (a/k/a Grecco). *Id.* at 61, 96. Galimi also stated that Dr. Wagle never suggested that the assailant was named Grecco or Wolshonak during the hour and a half session. *Id.* at 114, 116.

Grecco moves to suppress Galimi's statements during hypnosis and moves to bar Galimi's testimony at trial. At least one court has held that neither the government nor the defendant should be permitted to introduce statements made under the influence of hypnosis for the truth of the matter asserted. *Harker v. Maryland*, 800 F.2d 437, 441 (4th Cir.1986). The courts of appeals have taken two approaches to analyzing a challenge to the use of post-hypnotic testimony.[3] Most circuits analyze whether post-hypnotic testimony violates

---

**3.** The United States Supreme Court recently held that Arkansas's *per se* evidentiary rule excluding post-hypnotic testimony of criminal defendants impermissibly infringes defendant's constitutional right to testify on her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 62, 107 S.Ct.

2704, 2715, 97 L.Ed.2d 37 (1987). The Court expressly stated, however, that it expressed no view on the admissibility of previously hypnotized witnesses other than criminal defendants. *Id.* at 58 n. 14, 107 S.Ct. at 2712 n. 14.

defendant's sixth amendment right to confrontation or defendant's due process right to a fair trial under the fifth amendment. *See Chaussard v. Fulcomer,* 816 F.2d 925, 929 (3d Cir.), *cert. denied,* 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987); *Beck v. Norris,* 801 F.2d 242, 244 (6th Cir.1986); *Wicker v. McCotter,* 783 F.2d 487 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Clay v. Vose,* 771 F.2d 1, 4 (1st Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986). In *United States v. Valdez,* 722 F.2d 1196, 1201 (5th Cir.1984), however, the United States Court of Appeals for the Fifth Circuit considered the admissibility of the evidence under the Federal Rules of Evidence, holding that when a hypnotized subject identifies for the first time a person whom he or she has reason to know is already under suspicion, the post-hypnotic testimony is inadmissible no matter what procedural safeguards were used to sanitize the hypnotic session. *Id.* at 1203 (probative value of the post-hypnotic identification substantially outweighed by prejudice caused by identification). The two analyses, however, are not incompatible. The *Valdez* court *assumed* that use of the post-hypnotic testimony did not violate the defendant's constitutional rights; nonetheless, the court found that the post-hypnotic testimony was improperly admitted under the rules of evidence. *Id.* at 1204. Thus, the analysis under the rules of evidence is an additional, not alternative, theory for excluding the testimony.

The *Valdez* court recognized that not every witness who had been hypnotized would be incompetent to testify under Rule 601 of the Federal Rule of Evidence. *Id.* at 1204. A previously hypnotized witness could testify about "those matters which he or she was able to recall *and* [to] relate prior to hypnosis." *Id.* (quoting *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266, 1295 (1982) (emphasis in original)). The court concluded that, "[i]f a sufficiently reliable method exists for the witness to separate pre-hypnotic memory from post-hypnotic pseudo-memory, such testimony may be admissible." *Id.*

In sum, this court must analyze whether the use of Galimi's post-hypnotic testimony violates defendant's right to confront adverse witnesses or his right to a fair trial. *Chaussard v. Fulcomer,* 816 F.2d 925, 929 (3d Cir.), *cert. denied,* 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987). Even if the testimony withstands this scrutiny, the court may still exclude such evidence if it finds that its probative value is substantially outweighed by its prejudicial effect. *United States v. Valdez,* 722 F.2d 1196, 1201 (5th Cir.1984).

a Right to Confrontation

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him [or her]." U.S. Const. amend. VI. The United States Supreme Court has determined that, through the fourteenth amendment, the clause applies to state prosecutions. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "[A] primary interest secured by [the confrontation clause] is the right of cross-examination." *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The dual purposes served by cross-examination are to allow the defendant to impeach a witness's credibility and to expose a witness's biases and possible motives for testifying. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Clay v. Vose,* 771 F.2d 1, 4 (1st Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

The United States Supreme Court explained the problems of hypnotically refreshed testimony in *Rock v. Arkansas,* 483 U.S. 44, 59–60, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987). The Court noted that, with proper foundation, hypnosis might be useful to improve the accuracy of recall; however, its drawbacks included the potential for suggestibility, confabulation, and hardening of memory. *Id.* A hypnotized person is more likely to be led by suggestions made by the hypnotist or questioner, including messages from the attitude, demeanor, and expectations of the hypnotist, or his or her tone of voice and body lan-

guage. *Harker v. Maryland,* 800 F.2d 437, 441 (4th Cir.1986) (citing Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif.L.Rev. 313, 333 (1980)). Subconsciously, the subject may give the response he or she thinks the hypnotist wants to hear. *Rock,* 483 U.S. at 60, 107 S.Ct. at 2713; *Harker,* 800 F.2d at 441 (citing Diamond, 68 Calif.L.Rev. at 333). Additionally, confabulation may occur when the subject fabricates missing details by injecting parts of real memories that are unrelated to the situation the subject is trying to remember. *Harker,* 800 F.2d at 441. Finally, once a witness makes a statement under hypnosis, his or her confidence in the truth of that statement, whether genuine or invented, is greatly strengthened; a phenomenon known as "memory hardening." *Rock,* 483 U.S. at 60, 107 S.Ct. at 2714; *Harker,* 800 F.2d at 441. The witness would then have such an unshakable subjective conviction in the statement that his or her account on the witness stand would demonstrate absolute confidence even though the statement could be the product of suggestion or confabulation. *Harker,* 800 F.2d at 441.

This unshakable subjective conviction in the truth of one's own hypnotic or post-hypnotic statement implicates the sixth amendment rights of the defendant. "The witness's resultant undue confidence might violate the defendant's constitutional right to confront and [to] cross-examine adverse witnesses, for an absolute conviction in the accuracy of his [or her] memory might make it 'impossible to cross-examine [the] witness in any meaningful way.'" *United States v. Valdez,* 722 F.2d 1196, 1202 (5th Cir.1984) (quoting *State v. Mack,* 292 N.W.2d 764, 769 (Minn.1980)). *See also Clay v. Vose,* 771 F.2d 1, 4 (1st Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

Nonetheless, where the witness is subjected to extensive cross-examination and the jury has substantial information to aid it in evaluating the effect of the hypnotic session, hypnotically refreshed testimony does not violate defendant's right to confrontation. *Chaussard v. Fulcomer,* 816 F.2d 925, 931 (3d Cir.) (tape of session not required where no pre-hypnosis suspect and subject and hypnotist each vigorously cross-examined), *cert. denied,* 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987); *Beck v. Norris,* 801 F.2d 242, 244–45 (6th Cir.1986) (session videotaped and hypnotist testified); *Harker v. Maryland,* 800 F.2d 437, 441–42 (4th Cir.1986) (jury apprised of uses and dangers of hypnosis, full exploration of hypnotic event permitted, and subject cross-examined on opportunity for pre-hypnosis observation); *Clay v. Vose,* 771 F.2d at 4 (tapes of sessions and testimony of two experts on effect of hypnosis on witness's testimony admitted).

The government has presented evidence to show that Galimi was not hypnotized; thus, his identification could not have been the product of hypnotic suggestion. The court is extremely troubled by the government's evidence. Conspicuously absent is a transcript, an audiotape, or a videotape of the hypnosis session. The government has not explained its absence. Also missing is the testimony of the hypnotist or the testimony of any of the witnesses, including the two law enforcement officials and Galimi's father. In his police report dated April 30, 1979, then-Investigator Alan Grieco suggested that Galimi actually underwent hypnosis, stating "[a]t approximately 2:30 p.m. the procedure of hypnosis was ended." Yet this witness to the event was not called to testify at the evidentiary hearing.

Rather, the government's evidence consists of the testimony of an expert who was not present at the hypnosis. Dr. Orne interviewed the subject eleven years after the event to determine whether or not he had been hypnotized. Dr. Orne did not examine a transcript, an audiotape, or a videotape of the session; instead, he relied on Galimi's memory of events that occurred over eleven years ago.

Most conspicuous is the absence of Dr. Wagle, who performed the hypnosis. While the government's expert, Dr. Orne, testified that he interviewed Dr. Wagle for approximately one half-hour to reach his conclusion that Galimi was not hypnotized, he did not ask Dr. Wagle whether he had

any indication that Galimi was faking hypnosis at the time. In fact, Dr. Orne never asked the ultimate question of Dr. Wagle, that is, could Galimi have fooled him into believing he was hypnotized when he was not?

While the government's testimony was unrebutted, the court can not ignore that the exact phenomenon, that is, memory hardening, that makes post-hypnotic testimony so suspicious is consistent with events here. Before the session, Galimi told police that he recognized the assailants but he could not identify them. He told police that Mistretta's dying words were "Al Wolshonak did it." Thus, Wolshonak (a/k/a Grecco) was clearly a suspect before the hypnosis session. During the session, Galimi stated that he could not be certain, but he thought the assailant was Wolshonak. Testifying before the court, Galimi stated that he was absolutely certain that Wolshonak was the assailant. Galimi's increasing degree of certainty in the correctness of his identification is consistent with hypnosis and suggestion.

This court may require stringent procedural safeguards to assure that post-hypnotic testimony is not the product of suggestion or confabulation. *See United States v. Valdez*, 722 F.2d 1196, 1204 (5th Cir.1984) (pre-hypnotic memory permitted if preserved in written, audiotaped, or videotaped form); *United States v. Adams*, 581 F.2d 193, 199 n. 12 (9th Cir.) (at minimum, complete stenographic records of interviews of subjects setting forth who was present, questions asked, subject's responses—audio or video of session more helpful), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *State v. Hurd*, 86 N.J. 525, 545, 432 A.2d 86 (1981).[4] *See also Chaussard v. Fulcomer*, 816 F.2d 925, 930–31 (3d Cir.) (tape of session not required where no pre-hypnosis suspect), *cert. denied*, 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987). The court can find no authority to suggest that a lesser standard should apply when the subject asserts he was not hypnotized. In fact, the same procedural safeguards that assure the hypnotic session was not suggestive would assure that hypnosis was never actually achieved. The government, therefore, should be held to some minimum standard to show that the subject was not hypnotized during the session as that required to show that absence of suggestion during the session.

While the Third Circuit has not yet specified mandatory procedural safeguards for hypnotic sessions, this court finds that the government has failed to establish even a minimum foundation to show that Galimi was not hypnotized during the session. The government did not present any record of the session: no transcript, no audiotape, and no videotape. The court must rely on the eleven year old memories of the subject and hypnotist. The government did not offer any explanation for the absence of a record of the session. Additionally, several other witnesses were present during the session; however, none was called to testify. While Dr. Wagle may be a qualified psychiatrist, there is no indication in the record (1) of his experience in the use of hypnosis; (2) that he worked independent of the Bergen County Prosecutor's Office; or (3) of the information given to him before the session. In fact, the evidence tends to show that Wagle worked as the agent of the Bergen County Prosecutor's Office. Evidentiary Hearing of July 30, 1990, Transcript at 89; Evidentiary Hearing of June 13, 1990, Transcript at 141. Galimi's pre-hypnotic memories were recorded through the police reports filed in

4. The Supreme Court of New Jersey has six prerequisites to the admission of hypnotically refreshed recollections: (1) the hypnotist must be a qualified psychiatrist or psychologist who has experience in the use of hypnosis; (2) the hypnotist should work independently, not as agent for either party to the litigation; (3) all information given to the hypnotist before the hypnosis session must be recorded; (4) before hypnosis, the subject must describe the facts to the hypnotist as he or she then remembers them; (5) all contact between the hypnotist and the subject must be recorded, preferable on videotape, and (6) no person other than the hypnotist and subject should be present during any contact between the two. *State v. Hurd*, 86 N.J. 525, 545–46, 432 A.2d 86, 96–97 (1981). Notably, the Supreme Court of New Jersey adopted the safeguards at Dr. Orne's suggestion. *Id.* at 545, 432 A.2d at 96.

April 1979, not for the purposes of determining his pre-hypnosis memories, but for the purpose of recording the murder. The government has failed to show a single factor that would suggest the reliability of its evidence that Galimi was not hypnotized.

While the United States Court of Appeals for the Third Circuit has held that a tape of the session is not necessary when no pre-hypnosis suspect has been identified, *see Chaussard v. Fulcomer,* 816 F.2d 925, 930–31 (3d Cir.), *cert. denied,* 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1987), this case is clearly distinguishable. Grecco was a suspect in the Mistretta murder and Galimi was aware of that fact, because Galimi had told police of Mistretta's dying declaration; thus, *Chaussard* does not control here. In fact, a tape of the session would have greatly assisted the court in determining the credibility of Galimi's testimony that he was not hypnotized.

Having determined that the government did not satisfy its burden to show that Galimi was never hypnotized, the court turns to whether his post-hypnotic testimony is barred because it violates Grecco's right to confront adverse witnesses. At this time, however, the court is unable to evaluate whether Galimi's post-hypnotic testimony would impact Grecco's right to confront adverse witnesses. The court can not anticipate the extent of cross-examination that will be available to defendant at trial. In light of the court's holding on the due process question, however, this issue need not be determined here.

b Due Process Rights

■■■ The court must consider whether Galimi's post-hypnotic identification of Grecco is so unreliable that it violates his fourteenth amendment right to due process. Grecco contends that the hypnosis session was impermissibly suggestive such that use of Galimi's post-hypnotic statements will result in an unfair trial.

During the July 30, 1990 hearing, Grecco expanded his motion to bar Galimi's testimony, contending that his identification of Grecco resulted in part from the Bergen County Prosecutor's Office's coercive six and a half hour interrogation of Galimi several hours after the murder. The court held a *Wade* hearing as part of the proceedings on July 30, 1990. Grecco contends that this interrogation brainwashed Galimi into believing that Grecco was the assailant when Galimi's initial statements to police indicated that he was not. Galimi testified that, during the interrogation, representatives of the Bergen County Prosecutor's Office repeated badgered him while pointing to a photograph of Alan Wolshonak (a/k/a Grecco) saying, "He did it. Why don't you tell us he did it?" *See* Evidentiary Hearing of July 30, 1990, Transcript at 69. The government contends that Galimi knew Grecco for nearly fifteen years at the time of the Mistretta murder; thus, his identification resulted from his personal knowledge of Grecco and not the suggestion of law enforcement officers.

The testimony of a previously hypnotized witness may contravene due process because (1) the in-court identification may lack a basis that is independent from the hypnotic session, or (2) the procedures used during the hypnosis session may themselves be defective. *Harker,* 800 F.2d at 443. An independent basis for the identification, however, may compensate for defects in the hypnosis procedure. *Id.* The Supreme Court set forth the factors to be considered in assessing the quality of an independent basis for identification:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Even if the confrontation procedure was suggestive, the procedure does not violate due process if the identification is reliable under the "totality of the circumstances." *Id.*

This court finds that the hypnotic session was impermissibly suggestive when cou-

pled with the suggestiveness of the interrogation. According to Galimi, during the interrogation that took place shortly after the murder, officers from the Bergen County Prosecutor's Office repeatedly told him that he had seen the murder, even though Galimi denied seeing it. Evidentiary Hearing of July 30, 1990, Transcript at 68. The officers pointed to a picture of Grecco a few inches from Galimi's head and stated "He did it, didn't he? Tell us he did it." *Id.* at 67. In light of the fact that Galimi was visibly shaken from the murder and, earlier that night, had been taken to the hospital emergency room for a "panic attack," this conduct was extremely suggestive to a witness that was vulnerable to coercive pressure. The interrogation lasted roughly six and a half hours, until daybreak.

Two days later, Galimi went to the hypnosis session to avoid a lie detector test. *Id.* at 113. Notably, the government has not presented evidence that the session was free of suggestion. The government does not dispute that Dr. Wagle was aligned with the Bergen County Prosecutor's Office and that Galimi was aware of this fact. Evidentiary Hearing of July 30, 1990, Transcript at 89. Additionally, the presence of two officials Bergen County Prosecutor's Office during the hypnotic session could have affected Galimi while under hypnosis. *See United States v. Valdez,* 722 F.2d at 1201 (attitude, demeanor, and expectations of hypnotist, tone of voice, body language can communicate suggestive messages). At least one court has recognized that the subject may subconsciously give the response he or she thinks the hypnotist wants to hear. *See People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 269, 723 P.2d 1354, 1380–81 (1982) *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1984). Although it is unclear if Dr. Wagle asked all the questions or whether the officers participated through verbal or nonverbal communications, in light of his interrogation two days earlier, Galimi could not have doubted the response the hypnosis was intended to encourage.

Additionally, the absence of transcripts, tapes, or testimony from witnesses present at the session makes a determination whether the hypnosis session itself was suggestive on its own nearly impossible. Given the interrogation that preceded it, the court can not conclude that it was free of suggestion. The government, relying on its argument that Galimi was not hypnotized, failed to present any evidence that the session was free from suggestion by law enforcement. Although Dr. Orne concluded that no suggestion occurred because Galimi positively identified Grecco at the scene of the crime and, thus, had an independent recollection, *see* Evidentiary Hearing of June 13, 1990, Transcript at 59–60, the police reports from the incident show that Galimi was evasive about the identity of the assailants. *See, e.g.,* Report of Investigator John Scioli, Bergen County Prosecutor's Office, at 2 (May 18, 1979) (two assailants unnamed); Report of Detective Ronald McGill, Bergen County Prosecutor's Office, at 2 (Apr. 27, 1979) (Galimi did not affirm or deny that assailant was Wolshonak (a/k/a Grecco)); Incident Report of Sergeant Puzio, Garfield Police Department, at 2 (Apr. 27, 1990) (two assailants unknown to Galimi).

Nonetheless, even if the procedure is suggestive, it does not violate due process if the identification is nonetheless reliable under the "totality of the circumstances." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972). Here, Galimi had the opportunity to view the criminal at the time of the crime from his upstairs living room window. Although it was dark and raining outside, Galimi testified that he could see the assailants because a light shone directly over their heads. He presumably had a high degree of attention because he went to the window, after hearing screams, to find out what was happening outside. He also testified that he had known Alan Wolshonak (a/k/a Grecco) for nearly fifteen years at the time of the murder.

The quality of an independent basis for the identification may become lesser as time passes. The time elapsed between the crime and the identification is not clear here. Only two days passed between the

crime and the hypnotic session; however, Galimi's statement to the hypnotist was still ambivalent. He stated that the assailant could have been Wolshonak (a/k/a Grecco), but he was not certain. In fact, Galimi was still wavering when he testified before the grand jury nine years later when he stated, "I cannot be positive it was [Grecco]." Grand Jury Testimony of Frank Galimi, March 31, 1988, Transcript at 15–16. (Government Exhibit 8). Not until he testified before this court on July 30, 1990 did Galimi state unequivocally that the assailant was Alan Wolshonak (a/k/a Grecco). Likewise, Galimi's level of certainty increases with time. He hedged at first, when the identification should have been clearer in his mind. The court can not conclude that these factors weigh in favor of an independent basis for identification.

Galimi's prior description of the assailant is not inconsistent with his post-hypnotic description. Galimi initially described the assailants as two white males, medium height and build, under thirty years old. *See* Report of Investigator John Scioli, Bergen County Prosecutor's Office, at 2 (May 18, 1979). This generic description could include Grecco. Nonetheless, under the totality of the circumstances, this court can not conclude that the strength of the independent basis for identification overcomes the suggestiveness of the initial interrogation and the potential suggestiveness of the hypnosis session. Given that Galimi's eyewitness testimony is uncorroborated, admission of evidence that is the product of suggestive police procedures would violate Grecco's due process right to a fair trial. *Manson v. Brathwaite*, 432 U.S. 98, 102–14, 97 S.Ct. 2243, 2246–53, 53 L.Ed.2d 140 (1977). This outcome is consistent with that of other courts considering the admissibility of testimony elicited by hypnosis after a suspect has been named. *See, e.g., United States v. Valdez*, 722 F.2d 1196, 1203 (5th Cir.1984). "Identification under such circumstances, moreover, is more potentially prejudicial than probative. These principles require the exclusion of an uncorroborated personal identification, made only after hypnosis, of a person clearly singled out for suspicion." *Id.* Grecco's

motion to suppress the testimony of Frank Galimi regarding the events surrounding the murder of Vincent Mistretta will be granted.

### 4. Motion to Suppress Grecco's Statements and Physical Evidence

■ Grecco requests a suppression hearing in the event the government advises him that it intends to introduce any statement made by him or any physical evidence seized from him. He contends that, to date, the government has not advised him that it has any such statement or physical evidence. The government disputes that defendant was not informed of its intention to use Grecco's statement to police on September 20, 1977, in which he states that he had last seen Arthur Belli on September 13, 1977. Notes regarding the interview were released to defendant after this court's *in camera* review of documents during the detention hearings. Additionally, the government states that its discovery letter of September 20, 1989 advises defendant of the government's intent to introduce the statement.

This court agrees that defendant was on notice that the government intended to use the statement. Yet his motion to suppress fails to set forth any basis for suppression of the statement. Given that defendant was aware that the government intended to use the statement, yet he failed to assert any grounds for its suppression, the court will deny his request for a suppression hearing to determine the admissibility of the statement.

Likewise, defendant has offered no reason why this court should suppress any physical evidence seized from him. The court, therefore, will deny his motion to suppress physical evidence.

### 5. Motion for a Hearing on Admissibility of Mazzola's Convictions

■ Defendant Mazzola moves for a preliminary hearing on the admissibility, for impeachment purposes, of his prior convictions for armed robbery and conspiracy to commit armed robbery in 1982 and his

conviction for false swearing in 1985. Mazzola contends that the prejudicial value of this evidence far outweighs its probative value. Mazzola also contends that a preliminary hearing is necessary because the precise evidence, "coupled with the lack of sufficient, specific facts relating to same," that the government will introduce is unclear. *See* Brief of Defendant Mazzola in Support of Omnibus Motions, at 43–44. The government claims that the convictions are admissible under Rule 609(a) of the Federal Rules of Evidence for impeachment purposes, contending that both convictions involve dishonesty or false statement.

Rule 609(a) of the Federal Rules of Evidence provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

Fed.R.Evid. 609(a). The rule clearly distinguishes evidence of convictions of *crimen falsi*, that is, crimes involving false statements or dishonesty, which are admissible to impeach regardless of their prejudicial effect to the defendant, from other crimes. *Id.* For convictions that are not *crimen falsi*, but with penalties that exceed one year, the court must balance the probative value of admitting the evidence against its prejudicial effect to the defendant. *Id.*

The United States Court of Appeals for the Third Circuit, in *United States v. Wong*, 703 F.2d 65, 68 (3d Cir.) (per curium), *cert. denied*, 464 U.S. 842, 104 S.Ct. 140, 78 L.Ed.2d 132 (1983), stated that a judge has no authority to prohibit the government's effort to impeach the credibility of a witness by questions concerning a prior *crimen falsi* conviction. *Id.* The court noted that the legislative history of Rule 609(a)(2) unambiguously provided that "admission of prior convictions involving dishonesty and false statement is not within the discretion of the Court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted." *Id.* (citing H.R.Rep. No. 1597, 93rd Cong.2d Sess. 9, *reprinted* in 1974 U.S.Code Cong. & Ad.News 7051, 7098, 7103). Thus, to the extent Mazzola seeks to prevent admission of this prior conviction for false swearing, a *crimen falsi*, his motion is denied.

Mazzola's conviction for armed robbery and conspiracy to commit armed robbery, however, are not *crimen falsi*. *See Diggs v. Lyons*, 741 F.2d 577, 581 (3d Cir.1984) (admissibility of robbery conviction considered under Rule 609(a)(1) ), *cert. denied*, 471 U.S. 1078, 105 S.Ct. 2157, 85 L.Ed.2d 513 (1985). Thus, this court must balance the probative value of this evidence against the prejudicial effect on defendant. Fed.R. Evid. 609(a)(1). Mazzola also requests a pretrial hearing on the admissibility for impeachment of his armed robbery and conspiracy to commit armed robbery convictions.

In *United States v. Mahone*, 537 F.2d 922, 929 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), the United States Court of Appeals for the Seventh Circuit set forth the factors to be considered in balancing the probative value and prejudicial effect: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the crime charged; (4) the importance of defendant's testimony; and (5) the centrality of the credibility issue. *Id.* (citing 3 J. Weinstein, Evidence, ¶ 609[03] at 609–78 to 609–75 (1975) ). The *Mahone* court also urged trial judges, after a hearing on the record, to make an explicit finding that the prejudicial effect was outweighed by the probative value if the convictions were deemed to be admissible. *Id.* The court suggested that, at the hearing, the judge should require a brief recital by the government of the circumstances surrounding admission of the

evidence and a statement of the nature, place, and date of conviction. *Id.* The defendant should then be permitted to rebut the government's presentation. *Id.* The rationale supporting such a hearing was to avoid confusion over whether the trial judge had exercised his or her discretion under Rule 609 when admitting evidence of a prior conviction. *Id.*

While the Third Circuit has not adopted the requirement of a hearing, this court finds the rationale supporting the *Mahone* decision to be persuasive. The briefs submitted with the pretrial motions do not adequately set forth the facts for this court to balance the probative value against the prejudicial effect here; thus, a hearing is required for this court to balance properly the competing factors.

Additionally, under Rule 12(e) of the Federal Rules of Criminal Procedure, this court must determine Mazzola's pretrial motion before trial, "unless the court, for good cause, orders that it be deferred for determination at the trial." *Id.* In *United States v. Fountain*, 642 F.2d 1083, 1087 (7th Cir.), *cert. denied*, 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981), the Seventh Circuit stated that the trial court's failure to decide a pretrial motion on the admissibility of prior conviction before trial was not reversible error because defendant acceded to the court's pretrial request that an evidentiary hearing be held later. *Id.* at 1087. Nonetheless, the court noted that pretrial determination of such motions "save[s] jury time, and avoid[s] the waste that sometimes results from haste when side-bar matters have to be urged in the course of the trial." *Id.* at 1087 n. 2 (quoting *United States v. Cook*, 608 F.2d 1175, 1186 (9th Cir.1979) (en banc), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980)). The court acknowledged that, in the decision whether to testify, "[t]he issue of whether prior convictions will be admitted is a strong factor." *Id.* at 1087 n. 3. This court agrees. Defendant here requests a determination pretrial; this court finds no good cause to defer determination of the motion.

In sum, Mazzola is entitled to a pretrial hearing on the admissibility for impeachment of his convictions for robbery and conspiracy to commit robbery only. The court will grant his motion in part and deny it in part. The court will hold the hearing on the first day of trial before jury selection.

D. *Motions for Evidence from the Government*

1. Motion for *Brady* and *Giglio* Materials

■ Defendants have moved for disclosure of exculpatory evidence within the purview of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and impeachment evidence within the purview of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The government contends that production of impeachment materials at this time is inappropriate and states that it will disclose impeachment materials at the same time it releases *Jencks* materials for any witness.

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and material to either guilt or punishment. *Id.* The Supreme Court later explained that, in addition to exculpatory evidence, the *Brady* rule applies to evidence that might be used for impeachment purposes. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Courts have routinely used language that suggests that no distinction exists between *Brady* material and *Giglio* material. In *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985), the United States Supreme Court held that withheld *Giglio* materials must satisfy the *Brady* test of materiality, that is, its suppression undermines confidence in the outcome of the trial, to violate defendant's due process rights. *Id.* The Court stated that "[i]mpeachment evidence ... as well as exculpatory evidence falls within

the *Brady* rule." *Id.* at 676, 105 S.Ct. at 3380. Likewise, the United States Court of Appeals for the Third Circuit has stated that "the *Brady* rule covers evidence that might be used for impeachment purposes." *Carter v. Rafferty*, 826 F.2d 1299, 1305 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988).

Although both types of material fall within the *Brady* rule, distinctions may still be drawn between the two. The requirements of *Brady* are based on defendant's right to a fair trial; therefore, no due process violation occurs if the material is disclosed to defendant in time for its effective use at trial. *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir.1983). Whether materials are released "in time" for effective use at trial may vary with the type of material. The Court of Appeals for the Third Circuit distinguished materials required to cross-examine government witnesses from other materials subject to the *Brady* rule, holding that due process required disclosure of impeachment materials on the day that the witness to whom the materials apply testified. *See Higgs*, 713 F.2d at 44. The *Higgs* court acknowledged that the district court, within its discretion, could order disclosure of the names of cooperating witnesses to ensure the effective administration of the criminal justice system. *Id.* at 44 n. 6 (citations omitted). Nonetheless, the Third Circuit found that the district court abused its discretion by ordering that the government disclose impeachment materials approximately a week prior to trial because the government had showed reliable evidence that witnesses were threatened and that disclosure of witnesses' names far in advance of trial would substantially imperil their safety. *Id.* at 45.

Thus, this court rejects defendants' argument that the government must immediately release impeachment materials to comply with this court's discovery order. Still, given the complexity of this case, defendants may not have ample opportunity to review the impeachment materials if the government is not required to disclose until the day it calls its witness. Mindful of the potential threat to witnesses here, the court will require that the government disclose impeachment materials three working days before the trial begins. Defendants' motion for disclosure of *Giglio* material, therefore, will be granted in part and denied in part.

**2. Early Disclosure of Jencks Materials**

■ Defendants have also moved for early disclosure of Jencks materials. The Jencks Act, 18 U.S.C. § 3500(a) provides that no statement of a prospective government witness shall be subject to subpoena or discovery until the witness has testified on direct examination. *Id.* The government proposes to release Jencks materials during the week that the witness testifies.

The government has represented to this court that it has released all *Brady* materials to defendants. The government must comply with the requirements of constitutional due process under *Brady* over the statutory requirements of the Jencks Act. *See United States v. Starusko*, 729 F.2d 256, 263 (3d Cir.1984) (compliance with Jencks Act does not necessarily satisfy due process concerns of *Brady* ). Jencks materials that fall within the *Brady* rule must be released; the court presumes the government has already done so.

To the extent a witness's statement is impeachment material, it is governed by this court's determination that *Giglio* materials must be released to defendants three days before the start of trial. Although the Jencks Act permits disclosure only after the witness has testified, the court's determination that impeachment materials must be disclosed to defendants just before trial results from this court's conclusion that due process requires earlier disclosure to provide defendants ample opportunity to review the materials. Any less would deprive the defendants a fair trial under the due process clause. Thus, the court will order that the government disclose Jencks materials that fall within *Giglio* three days before the start of trial. In accordance with the Third Circuit's policy favoring disclosure, *see id.* at 261, the government should resolve any questionable issues in

favor of disclosure to defendants. *See Agurs*, 427 U.S. at 106, 96 S.Ct. at 2398.

For statements of prospective government witnesses that do not fall with *Brady* and *Giglio*, however, this court is without authority to order early disclosure under *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir.) (Jencks Act denies district court power to compel early production of statement of government witness), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978). Thus, the court will deny defendants' motion to the extent it requests disclosure of witnesses' statements that do not fall within *Brady* and *Giglio*.

### 3. Motion for Coconspirators' Statements

■ Defendants move for disclosure of all statements of alleged coconspirators as "statements of the defendant" under Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure. Defendants argue that, because the statements of defendants' coconspirators would be admissible against them under Rule 801(d)(2)(E), they are entitled to such statements as if they made the statements themselves. The government argues, however, that all statements of coconspirators are not available to defendants because such statements are subject to the Jencks Act. (citing *Vastola*, 670 F.Supp. at 1268).

As above, the statements of coconspirators that fall within *Brady* and *Giglio* are governed by this court's order that *Brady* materials be released immediately and *Giglio* materials be released three days before the start of trial. Likewise, statements of coconspirators that fall within the definition of Jencks material may not be disclosed until the prospective witness testifies at trial. The government has agreed to make these statements available during the week that the witness testifies.

For those coconspirator's statements that are neither *Brady, Giglio,* or Jencks materials, this court concludes that pretrial disclosure is not mandatory. Although the Third Circuit has yet to speak on this issue, this court agrees with other district courts within the circuit that have rejected defendants' argument that they are entitled to statements of coconspirators before trial. *See United States v. Fischbach & Moore, Inc.*, 576 F.Supp. 1384, 1390 (W.D.Pa.1983) (statements of coconspirators fall within Jencks Act and not Rule 16); *United States v. Ahmad*, 53 F.R.D. 186, 189 (M.D. Pa.1971) (defendant not entitled to statements of codefendants or coconspirators). The court, therefore, will deny defendants' motion to the extent it requests disclosures of statements that are not *Brady, Giglio,* or Jencks materials.

### 4. Motion for a Witness List

■ Defendants move for a list of the government's anticipated witnesses. They contend that the complexity of this case and delay since the alleged acts occurred requires that the court order disclosure to assure a fair trial.

Defendants are not entitled to a witness list under *Brady*. *United States v. DiPasquale*, 740 F.2d 1282, 1294 (3d Cir.1984) (government not required to divulge identity of witnesses in noncapital case), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *Vastola*, 670 F.Supp. at 1268 (disclosure of witness list not required by *Brady* ). The court will deny defendants' motion.

### 5. Motion for a Bill of Particulars

■ Defendants request an extensive bill of particulars and maintain that the indictment fails to provide them with the minimal level of information needed to investigate the charges against them. The purpose of a bill of particulars is "to inform the defendant of the nature of the charges brought against him [or her], to adequately prepare his [or her] defense, to avoid surprise during the trial and to protect him [or her] against a second prosecution for an inadequately described offense." *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). A bill of particulars "is not intended to provide the defendant with the fruits of the government's investigation," but

rather to give the defendant "only that minimum amount of information necessary to permit the defendant to conduct his [or her] *own* investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir.1985) (emphasis in original). In considering whether a bill of particulars is appropriate, the court may consider not only the indictment, but also all of the information that has been made available to the defendant. *Fischbach & Moore, Inc.*, 576 F.Supp. at 1389.

Defendants are entitled to "be informed of those central facts which would enable him [or her] to conduct his [or her] own investigation," but is not entitled to unlimited discovery. *United States v. Johnson*, 524 F.Supp. 199, 207 (D.Del.1981), *rev'd on other grounds*, 690 F.2d 60, 66 (3d Cir. 1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). To the extent that the government is able to do so, the precise date and place of each event alleged in the indictment should be provided. *Vastola*, 670 F.Supp. at 1270 (citing *United States v. Holman*, 490 F.Supp. 755, 762 (E.D.Pa.1980)). In addition, the government should disclose "the names of all coconspirators or participants in the alleged offenses should be provided, 'except insofar as the Government can show, *in camera*, that such disclosures might endanger the safety of prospective witnesses.'" *Id.* (quoting *Holman*, 490 F.Supp. at 762). The government, however, is not obligated to provide uncharged overt acts and uncharged criminal conduct. *Id.* (information not central to offense charged) (citing *United States v. Armocida*, 515 F.2d 29, 55 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975)).

This court rejects defendants' contention that the government must set forth the amount of any payments allegedly made in the operation of the alleged sports and numbers gambling businesses. Cases cited by defendants are clearly distinguishable in that defendants in each were indicted for receipt of unauthorized monies for performance of an official duty. *See United States v. Joseph*, 510 F.Supp. 1001, 1006 (E.D.Pa.1981) (government must disclose the amount of the alleged bribes defendant received); *United States v. Dean*, 266 F.Supp. 159, 160 (S.D.N.Y.1966) (government must disclose amount of bribe). The instant indictment does not charge any defendant with bribery; therefore, *Joseph* and *Dean* are distinguishable on their facts. Defendants cite no authority for the proposition that indictments for gambling offenses require this same specificity.

The government has represented to the court that it has supplied the defendants with a list of 76 coconspirators. Nonetheless, the government must disclose the names of the participants in the alleged offenses unless it can show that the disclosure might endanger the safety of specific witnesses. To the extent the indictment alleges that "others" were involved, the government must specify who the "others" are. Information must be supplied to the defendants within fifteen days of the attached order; however, if the government must make an *in camera* submission to the court, the submission shall be made within ten days of the attached order.

Additionally, the government contends that the indictment specifies dates and locations of the alleged offenses; thus, further specificity is not required. The government, however, must provide precise dates and locations of the alleged acts. The allegations in the indictment that events occurred "elsewhere" are insufficiently specific "to inform the defendant of the nature of the charges brought against him [or her], to adequately prepare his [or her] defense, to avoid surprise during the trial and to protect him [or her] against a second prosecution for an inadequately described offense." *See Addonizio*, 451 F.2d at 63–64. The additional information requested by defendants is not "central facts;" therefore, this court will not order its disclosure. The court provided substantial information to defendants during the pretrial detention hearings. The indictment, coupled with this extensive disclosure, will adequately inform defendants to allow them to prepare their defenses. *See Fischbach & Moore, Inc.*, 576 F.Supp. at 1389. The court, therefore, will grant in part and deny in

part defendants' motion for a bill of particulars.

### 6. Motion for the Names of Informants

■ Defendants have moved for disclosure of the names and addresses of all informants. Defendants maintain that any informants may have been witnesses to conduct that the government alleges is criminal; therefore, this court must order disclosure because the informants can give testimony that is relevant and material to the defense. Defendants urge disclosure is particularly essential here because the acts in the indictment occurred so long ago.

The informer's privilege permits the government to withhold from disclosure the identity of persons who furnish information of crime to law enforcement. *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957) (trial court committed prejudicial error by permitting government to withhold identity of its undercover employee). In determining whether to require disclosure, the court must balance the public interest in protecting the flow of information against the individual's right to prepare his defense. *Id.* at 62, 77 S.Ct. at 629. The court must consider the particular circumstances of the case, including the nature of the crime charged, the possible defenses, including the defense of entrapment, and the potential significance of the informant's testimony. *Id.* at 63–65, 77 S.Ct. at 629–30.

Defendant has the burden to show his need for the informant's testimony. *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir.1981) (no disclosure required where very high risk of physical harm to informant who was sole eyewitness and defendant sought to impeach informant's identification of him), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 465 (1982). "[M]ere speculation that an eyewitness may have some evidence helpful to defendant's case is not sufficient to show the specific need required by *Roviaro.*" *Id.* (citations omitted).

Defendants have failed to meet their burden for disclosure of informants' names. Defendants assert only that informants may have been eyewitnesses to certain conduct and their testimony may be helpful to the defense; however, mere speculation that informants' testimony may be useful is insufficient to justify disclosure of an informant's identity. *Id.; United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir.1977) (no disclosure where informant did not deal directly with defendant nor was significant participant in criminal events). "The defendant must indicate some concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information" from informants to law enforcement "and the informant's private interest in his [or her] own safety." *Estrella*, 567 F.2d at 1153 (citations omitted). Defendants here have done neither; thus, their motion for disclosure of the names of informants will be denied.

### 7. Motion for Rough Notes

Defendants move for an order instructing the government to preserve all agents' rough notes and handwritten drafts of reports pursuant to *United States v. Vella*, 562 F.2d 275, 276 (3d Cir.1977) (per curiam) (rough interview notes of FBI agents should be kept and produced), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). The government has represented to this court that all officers who participated in the investigation and prosecution of this case have been instructed to preserve any rough notes. Because the government contends it has preserved rough notes for this court's review, the court finds that defendants' motion for an order requesting the same is unnecessary; thus, it will deny defendants' motion for an order.

### 8. Motion to Serve Subpoenas

■ Defendants have moved for authorization to serve subpoenas for materials in the possession of third parties that are "vital to defendant[s'] defense at trial." Defendant Grecco's Brief at 70. Defendants contend that Rule 17 of the Federal Rules of Criminal Procedure permits this court to order "production of books, papers, documents or objects designated in

the subpoena be produced before the court at a time prior to trial." Fed.R.Crim.P. 17. Defendants fail to specify what materials they seek.

While this court agrees that defendants are entitled to process, it notes that it previously determined that such process is limited. *See United States v. Gatto,* 729 F.Supp. 1478 (D.N.J.1989) (*in camera* review of subpoenaed documents). In *Bowman Dairy Co. v. United States,* 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951), the United States Supreme Court held that courts must protect against disclosure of the identity of informants as well as the method, manner, and circumstances of the government's acquisition of materials described in the subpoena. *Id.* Additionally, Rule 16 of the Federal Rules of Criminal Procedure restricts disclosure of reports or documents made by "the attorney for the government or other government agents in connection with the investigation or prosecution of the case" or the statements of prospective witnesses except as permitted by the Jencks Act. Fed.R. Crim.P. 16. This court has interpreted the "attorney work product" provision of Rule 16 to include only those materials prepared on the current case, not that of past or unrelated cases. *See United States v. Gatto,* 729 F.Supp. at 1481 (D.N.J.1989). The court may also deny access to the subpoenaed documents if compliance with the subpoena would be oppressive or unreasonable. Fed.R.Crim.P. 17(c). Thus, in November 1989, when defendants subpoenaed documents from the state law enforcement authorities, the court reviewed the documents *in camera* before ordering the release of *Brady* materials to defendants. *See United States v. Gatto,* 729 F.Supp. 1478 (D.N.J.1989) (*in camera* review of subpoenaed documents).

The government requests that the court use the same procedure here to protect the identity of informants and the methods of the government's receipt of information. The court agrees that the method used at the detention hearings is the superior method to assure that defendants receive those materials to which they are entitled without jeopardizing the government's access to information. Nonetheless, the court can not grant defendants' motion because it fails to specify what materials they seek or what parties they wish to subpoena. Thus, the court can not grant or deny a specific application for information. Rather, the court will require that defendants present to the court the specific information sought and the parties they wish to subpoena with contention why the materials are relevant. The government will have an opportunity to object to the subpoena based on *Bowman Dairy,* privilege, or oppressiveness. The court will review the documents *in camera* before the subpoenaed parties must release them to the defendants to assure that disclosure is proper. As the court suggested in its previous opinion, the government or the parties have the obligation to specify precisely the information they contend violates *Bowman Dairy* or is not otherwise privileged and to submit to the court a redacted version of the document in dispute.

The court, therefore, will deny defendants' motion without prejudice subject to defendants' proper specification of the materials they intend to subpoena and the relevance of those documents.

9. Motion for Disclosure of Grand Jury Transcripts

■ Defendants have moved for disclosure of all grand jury transcripts based on the government's alleged prosecutorial abuses. Mazzola also moves for disclosure based on the statute of limitations, insufficient evidence, or abuse of the grand jury process.

The proper functioning of the grand jury system requires secrecy of grand jury proceedings. *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958) (maintenance of secrecy of grand jury proceedings is long established policy). The policy of secrecy is designed "to prevent from disclosure ... the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process...." *In Re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir.

1980) (state commission need not show compelling need for documents subpoenaed by grand jury unless party objecting first shows grand jury secrecy jeopardized), *cert. denied,* 449 U.S. 1081, 101 S.Ct. 865, 66 L.Ed.2d 805 (1981). The general rule of grand jury secrecy prevents disclosure of not only "information from transcripts of grand jury proceedings, but also [of] anything which may reveal what occurred before the grand jury." *In Re Grand Jury Matter (Catania),* 682 F.2d 61, 63 (3d Cir. 1982) (not all materials from FBI investigation disclosed). The policies supporting grand jury secrecy include:

(1) [t]o prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect [an] innocent accused who is exonerated from disclosure of the fact that he [or she] has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Procter & Gamble Co.,* 356 U.S. at 681 n. 6, 78 S.Ct. at 986 n. 6 (quoting *United States v. Rose,* 215 F.2d 617, 628–29 (3d Cir.1954)).

Rule 6(e)(3) of the Federal Rules of Criminal Procedure provides exceptions to the general rule of secrecy. Disclosure of grand jury transcripts is permitted "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R.Crim.P. 6(e)(3)(C)(ii).

The party seeking disclosure of grand jury transcripts must set forth a particularized need for the desired disclosure. *Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 567, 103 S.Ct. 1356, 1361, 75 L.Ed.2d 281 (1983). Absent a showing of "substan-tial likelihood of gross or prejudicial irregularities in the conduct of the grand jury," a court should not order pretrial disclosure of transcripts of grand jury proceedings. *United States v. Budzanoski,* 462 F.2d 443, 454 (3d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972). "Mere speculation that such improprieties may have occurred will not suffice to support that required showing." *Id.* Likewise, the court should not order disclosure of other records of or information about grand jury proceedings, such as dates, attendance records, vote tally sheets, or witness lists, without a showing of particularized need. *United States v. Vaughn,* 510 F.Supp. 206, 209–10 (D.N.J.1981). Grand jury proceedings are cloaked with the presumption of regularity, *see United States v. Mahoney,* 495 F.Supp. 1270, 1274 (E.D. Pa.1980); *Hamling v. United States,* 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974); thus, a defendant must come forward with a minimum quantity of evidence to justify further discovery of grand jury materials.

Once a party makes the required showing of need, the court must balance the competing interests and may order disclosure as required to meet the ends of justice. In balancing the secrecy requirement with the need for transcripts, the United States Supreme Court has stated that:

Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need to disclose is greater than the need for continued secrecy, and that the request is structured to cover only material so needed.

*Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979) (footnote omitted). "[T]he typical showing of particularized need arises when the litigant seeks to use 'the grand jury transcript at the trial to impeach a witness, to refresh his [or her] recollection, to test his [or her] credibility and the like." *Id.* at 222 n. 12, 99 S.Ct. at 1674 n. 12 (quoting *Procter & Gamble Co.,* 356 U.S. at 683, 78 S.Ct. at 986). As the considerations justifying secrecy become

less relevant, a party asserting the need for the grand jury transcripts will have a lesser burden. *Id.* 441 U.S. at 223, 99 S.Ct. at 1675.

Defendant Grecco asserts that he has a compelling need for disclosure of the transcripts because the government acted in bad faith by delaying the indictment. This court previously rejected defendant's contention that the government acted in bad faith or improperly delayed the indictment. *See supra* at section (B)(1). Grecco's motion for disclosure of the grand jury transcripts on this basis will be denied.

Grecco also asserts that the government may have withheld exculpatory information from the grand jury. Defendant suggests that the government did not provide the grand jury with evidence that might tend to discredit the testimony of Frank Schneider and Frank Galimi, who apparently testified at the grand jury proceedings. Defendant's speculation about the possible exclusion of this evidence does not satisfy the requirements of *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.1972) that defendant show "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *Id.* As the *Budzanoski* court noted, "mere speculation that such improprieties may have occurred will not suffice to support that required showing." *Id.* Such a standard would undermine the strong policies supporting secrecy of grand jury proceedings. *See Procter & Gamble Co.*, 356 U.S. at 681, 78 S.Ct. at 985. The court will deny defendants' motion for disclosure of the grand jury transcripts.

Defendant Mazzola asserts that his particularized need stems from the fact that each count is barred by the statute of limitations and that the indictment is insufficient on its face. The court has rejected Mazzola's statute of limitations argument with respect to the conspiracy count, *see supra* at section (B)(7); thus, the court will deny his motion for release of the grand jury transcripts to prove this contention. Additionally, defendant's contention that he must peruse the grand jury record to substantiate his motion to dismiss the indict-

ment for failure to specify predicate acts is rejected. In light of this court's order that the government provide a bill of particulars setting forth the specific dates and locations of the acts alleged in the indictment, *see supra* at section (D)(5), it need not order disclosure of the grand jury transcripts to provide this same information. The court will deny Mazzola's motion for disclosure of the grand jury transcripts.

█ Defendants also move for disclosure of the grand jury attendance and voting records. They contend that the complexity of this case required the grand jury to meet over a substantial period of time. They suggest, at a minimum, that this court must review the records *in camera* to ascertain whether voting and attendance requirements were met. The government, however, has represented to the court that it complied with the requirements of *United States v. Provenzano*, 688 F.2d 194, 203 (3d Cir.1982) (replacement and absent grand jurors must be given opportunity to review transcripts of missed sessions), and that all of the grand jurors who voted on the indictment were furnished with a sufficient opportunity to review the evidence presented to the panel over the course of the grand jury investigation. In *Provenzano*, the Third Circuit held that an indictment returned by a grand jury that met on 23 separate occasions and from which several grand jurors were absent did not violate defendant's rights. *Id.* The Third Circuit relied on the district court's *in camera* review of the grand jury records that determined the number of sessions missed by jurors voting on the indictment. *Id.* The court here does not have the benefit of this information. It is possible that numerous absences occurred. Although the government represents in its brief that it met the requirements of *Provenzano*, this court will order the government to present the court for *in camera* review an affidavit setting forth the number of sessions, the dates that each juror was absent, and the provisions made for providing absent jurors transcripts of the missed sessions. The government will submit this information to the court for *in camera* review within ten days of the entry of the attached

order. The court will reserve judgment on defendants' motion for the attendance and voting records of the grand jury pending its review of the government's affidavit.

### 10. Motions for Disclosure of 404(b) Material of Prior Bad Acts

■ Defendants move for a pretrial determination of the admissibility of evidence of prior bad acts under Rule 404(b) of the Federal Rules of Evidence and maintain that the government must disclose what evidence it intends to use to allow defendants to confront the evidence effectively and to prepare adequately their defenses. Defendants argue that it is unfair to wait until the "heat of battle" at trial for this court to determine the admissibility of such evidence because the court is constrained by time pressures. *See* Transcript of Oral Argument on Pretrial Motions, at 32 (June 8, 1990). They argue that judicial administration is served by avoiding mid-trial continuances.

Recently, the United States Supreme Court set forth the guidelines for admission of other crimes evidence in *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). In *Huddleston*, the Court held that evidence of similar bad acts is admissible if there is sufficient evidence to support a jury finding that defendant committed the similar act. *Id.* The Court stated that, with this rule, protection from unfair prejudice emanates from four sources; first, that the other crimes' evidence must have a proper purpose; second, that the proffered evidence must be relevant; third, that its probative value must outweigh its potential for unfair prejudice; and fourth, that the court must charge the jury to consider the other crime's evidence only for the limited purpose for which it is admitted. *Id.* at 691–92, 108 S.Ct. at 1502. The court must examine all the evidence in the case and decide whether the jury can reasonably find the conditional fact by a preponderance of the evidence. *Id.* at 690, 108 S.Ct. at 1501–02.

This court has previously held that the balancing of the prejudicial effect of the evidence against the probative value of the evidence of prior conduct, prior convictions, or bad acts "is most effectively done at trial when such evidence can be evaluated in the factual context of the government's case and the defense put forward." *Vastola*, 670 F.Supp. at 1268. Likewise, the court finds that the evaluation under *Huddleston* of the purpose and relevance of the other crimes' evidence is better evaluated within the context of the case. The court, therefore, will deal with these issues as they arise and outside the hearing of the jury. Defendants' motions for a pretrial hearing on the admissibility of prior bad acts under Rule 404(b), therefore, will be denied.

### E. Motions to Dismiss for Improper Governmental Conduct

Defendants raise several arguments based on egregious governmental conduct which they contend entitles them to dismissal of the indictment. Defendants contend that the government delayed bringing the indictment for fifteen years to prejudice defendants and that the government withheld the statements of coconspirators. As this court previously discussed, *see supra* at section (B)(1), the government has not delayed the indictment to gain a tactical advantage; thus, defendants are not entitled to dismissal of the indictment on this basis.

Grecco contends that the court must dismiss the indictment because the government has withheld the substance of oral statements made by him to government officials. The court flatly rejects this contention. After an exhaustive review of the voluminous materials subject to the November 1989 subpoenas, this court made available extensive discovery to Grecco. All materials that fell within the purview of *Brady* that did not jeopardize the government's access to information from informants or was otherwise privileged were released to defendant at that time. *See United States v. Gatto*, 729 F.Supp. 1478 (D.N.J.1989) (document 75—notes of Grecco interview with police released to defendant). To the extent Grecco refers to

statements other than those previously released in November 1989, he has failed to specify what statements he seeks. The court will deny defendant's motion, therefore, because it fails to specify any basis for the court to dismiss the indictment.

### F. *Motion to Transfer*

Finally, the court will deny defendants' motion to transfer to this case to the Newark vicinage. The District of New Jersey is a single district. This court routinely tries criminal matters arising throughout the state and finds no reason to do otherwise here.

### III. CONCLUSION

An appropriate order will be entered.